**LYNCH v. WARNER BROS. PICTURES, Inc., et al.**

District Court, S. D. New York.
April 11, 1940.

Conboy, Hewitt, O'Brien & Boardman, of New York City (David Asch, of New York City, of counsel), for plaintiff.

Thomas & Friedman, of New York City (George E. Quigley and Joseph D. Karp, both of New York City, of counsel), for defendants.

GALSTON, District Judge.

This action is for an injunction and accounting of profits and damages resulting from the alleged infringement of the plaintiff's literary property, an uncopyrighted story. Jurisdiction is predicated on diversity of citizenship.

In April or May of 1932 the plaintiff wrote a story entitled "When Homer Comes Marching Home," which, on August 2, 1932, he submitted to Warner Brothers Pictures, Inc. He told Deakin, the Warner representative, that he thought it was suited particularly for the talents of the defendant Joseph E. Brown, an actor. The defendant Warner Brothers thereafter rejected the story and returned the manuscript.

Lynch said that at that time Deakin observed that the story was returned with very favorable comment and showed Lynch a synopsis of the story set forth in perhaps two-thirds of the sheet, at the bottom of which was the comment of the reader, a Virginia May Cooke. This synopsis was not produced. Lynch's recollection of the comment was that the story had possibilities for a comedy picture and reference

was made to the wild ride in the airplane, an incident of the story.

There is no denial by the defendants of access to the story; nor that someone prepared a synopsis, for the letter of January 12, 1934, sent to plaintiff's attorney, refers to a paper in his files of "what purports to be a synopsis of your client's story. I do not know who prepared this synopsis."

Moreover, Lynch testified that on October 24, 1932 he met the defendant Brown and pursuant to an arrangement with him left his story in Brown's mail box in the Mastbaum Theatre in Philadelphia. Returning two nights later, he says that Brown sent word that the story was not acceptable and returned it. It must be observed that there is no testimony about a letter accompanying either the transmission of the story or its return.

The challenged play is "Son Of A Sailor", in which Brown acts the lead part, a sailor.

The picture follows a scenario which went through a process of writing and re-writing in which a number of authors contributed, among them Paul G. Smith, Al Cohn, Peter Milne, Ernest Pagano and H. M. Walker. The depositions of all of these writers were taken with the exception of that of Walker, deceased. The origin of the play dates back to "The Gob", a vaudeville skit written by Smith in 1922 for use in the Greenwich Village Follies. Brown appeared in that production. Smith testified that the skit "had to do with the idea of a sailor who won the affections of ladies by appealing to their maternal instinct, exhibiting the shoes of a baby which he claimed as his sister's child, a hundred per cent lie, and during the course of the action he told the same lie, embellished, to four different girls." This sketch was subsequently acted in vaudeville over a period of twelve years. Later it was sold by a partner of Smith to the defendants, Warner Brothers; and Smith was thereupon employed, in collaboration with Cohn, to write a screen play based on the skit. Such material as was adaptable for the screen was retained and such dialogue, situations and actions were added as they thought would make a suitable screen play for Joe E. Brown.

These authors conceived the idea of a sailor attempting to win the interest of a young girl, not aware that she was the daughter of his superior officer, visiting her home at her invitation, the concoction of various adventures at the admiral's home, culminating in the pursuit of a member of the house party who had stolen plans which related to a secret airplane device. This device, set at a certain wave length, would cause the plane automatically to return to its home destination, a sort of mechanical homing pigeon. The playwrights devised the incident disclosing Brown as the hero in the airplane in a series of extraordinary gyrations which finally landed him on the deck of an obsolete battleship. The battleship was to be used as a target in gunnery practice. Their scenario describes the blowing up of the ship with Brown (rather "Handsome", the name of the character in the play) pushed into the water and (as Smith described his first draft of the scenario) "everything ending happily".

After Smith and Cohn had worked out a rough draft it was handed to two other writers, Pagano and Walker, for polishing. Later Smith was assisted by Milne, when the scenario was returned to him. There were further changes made. Subsequently Smith and Cohn eliminated a great deal of the material that had been incorporated in the Pagano and Walker script, substituted other situations, and put the script practically in the condition it was at the beginning.

All of these writers denied that they had ever had in their possession the story "When Homer Comes Marching Home", nor had they ever heard of its existence; and at no time did anyone ever tell them or reveal to them the contents of the story.

Cohn explained that his first connection with the motion picture, "Son Of A Sailor", was some time during the summer of 1933, when he was informed that the company had purchased or was about to purchase a one-act vaudeville skit entitled "The Gob" and that it contained an idea that Joe E. Brown liked very much. He confirmed Smith with respect to the writing of the first and subsequent drafts of the story. Cohn said that he contributed to the plot the situations involving the relations between "Handsome" and the naval officers, and also the romantic element. He also contributed the part of the plot which had to do with "Handsome's" going up in an airplane, being forced to bail out and landing on the obsolete warship. Cohn said: "I don't claim any particular originality for the situation involving a

man flying an airplane without any knowledge of the technique of flying, as that is a rather common source in both literature and the stage." He claimed, however, that landing on the battleship was original and that it provided the principal element in the story so far as comedy and entertainment were concerned. He denied that any of the ideas, sequences, characters, dialogue, events, plot or story material of "When Homer Comes Marching Home" was used in creating the scenario of "Son Of A Sailor". He added: "I believe a comparison will show no point of similarity except that the leading character went up in an airplane and that he was a sailor in the Navy. The hero of the vaudeville skit was a sailor in the Navy, and the airplane incident was, as I have stated before, a very ancient and hackneyed device."

Joe E. Brown testified that he suggested to Warner Brothers that they buy the skit "The Gob", which had been written by Paul Gerard Smith. He denied that he ever met the plaintiff and that he had ever read the plaintiff's story. He also said he had never had it in his possession. He denied that he met Lynch at the theatre, as Lynch testified, saying: "I am also certain of this because it is difficult for anyone to reach me while I am making personal appearances unless I know them or know their connection. There is very little chance that this man himself met me and delivered this story to me. By this man I refer to Mr. Lynch."

Defendants' witness, Albert S. Howson, an editor of scenarios, formerly an actor over a period of twenty-nine seasons, testified that he had known of the literary or dramatic device involving a person unfamiliar with the operation of an airplane finding himself in circumstances which require him to manipulate the plane. He referred to the plays "The Aviator", released in 1929; another, "Going Wild", released in February 1931; "Lilac Time" in August 1928; and "Sky Pilots", January 24, 1932.

The most that can be said of the comparison of the plaintiff's story and the defendants' moving picture play is superficial similarity in the airplane incident and the so-called court-martial hearing; but proof of a purloining of a substantial part of the plaintiff's property is lacking. To succeed it is necessary for him to establish that there was a substantial and material part of the plaintiff's story that was so appropriated. Dymow v. Bolton, 2 Cir., 11 F.2d 690; Wilson v. Haber, 2 Cir., 275 F. 346; Rush v. Oursler, D.C., 39 F.2d 468; Nichols v. Universal Pictures Corporation, 2 Cir., 45 F.2d 119; 18 Corpus Juris Secundum, Copyright and Literary Property, page 218, § 94; Fendler v. Morosco, 253 N.Y. 281, 292, 171 N.E. 56.

Certainly the theme of the plaintiff's story is not found in the defendants' play. Indeed, it may be doubted whether there is any unified theme in the moving picture beyond the characterization of its central character as a braggart, a simple, clownish person with a certain likableness, engaged in a series of laughable episodes culminating in the final scene showing him unreformed. The love incident of the story is certainly not in any sense copied in the play. There is no suggestion of a clown-like character in the plaintiff's story. The plaintiff's story has a serious side despite some humorous suggestions. Indeed it is essentially serious. The fundamental object, on the other hand, of the play is buffoonery effectively carried out. Thus there is difference in plot, action and treatment. In consequence I am unable to find any invasion of the plaintiff's rights. In this view of the matter it becomes unnecessary to dispose of defendants' contention that this court has no jurisdiction because the matter in controversy does not exceed $3,000.

The complaint will be dismissed.

Submit findings of fact and conclusions of law in conformity with the foregoing opinion.