## DE MONTIJO v. 20TH CENTURY FOX FILM CORPORATION et al.

### No. 1025.

District Court, S. D. California, Central Division.

July 23, 1941.

134

Willedd Andrews and P. Talbot Hannigan, both of Los Angeles, Cal., for plaintiff.

Alfred Wright and Gordon Hall, Jr., both of Los Angeles, Cal., for 20th Century Fox Film Corporation and another.

David C. Marcus of Los Angeles, Cal., for Azteca Film Distributing Co.

Homer I. Mitchell (of O'Melveny & Myers), of Los Angeles, Cal., for Sue Carol.

J. F. T. O'CONNOR, District Judge.

This is an action for copyright infringement commenced by filing a complaint in the Superior Court, County of Los Angeles, State of California, and the action was thereafter removed to this court. On March 31, 1941, a third amended complaint was filed.

Plaintiff alleges that on or prior to February 16, 1939, he invented, originated, composed and wrote certain original literary composition and moving picture scenario and dramatic composition entitled "The Rebel or the Birth of a Revolution" as a stage play, and also rewrote said play in scenario form for motion picture production under the title, "Viva Madero"; that he is the owner of the copyrights to the same; and alleging delivery of said copyrighted material to the defendants and, in addition thereto, plaintiff prepared a synopsis of the material contained in the literary composition and moving picture scenario and delivered same to the defendants.

Plaintiff further alleges that the defendants copied and appropriated his literary composition and moving picture scenario without his consent, and exhibited same in sound and talking picture photoplays designated as "The Cisco Kid and the Lady" and "Viva Cisco Kid" and "En Tiempos De Don Porfirio". Plaintiff further alleges that defendants claim that motion pictures mentioned were wholly original with defendants and were their sole and exclusive property. Plaintiff alleges general and exemplary damages in the sum of $400,000. All of the allegations are put in issue by the answers.

Plaintiff introduced in evidence a copy of "The Rebel or the Birth of a Revolution", being an unproduced stage play, and also copy of "Viva Madero", a screen play based on the stage play, and a synopsis of the screen play prepared by plaintiff. The synopsis shows that the story follows the historians of the period during the Madero-Diaz controversy. The scenes are all laid in old Mexico. A summary of plaintiff's stage play, "The Rebel or the Birth of a Revolution" and plaintiff's screen scenario, "Viva Madero", which is based upon the stage play, both unpublished manuscripts, is necessary in order to compare plaintiff's work with the three photoplays which plaintiff claims are infringements.

In "Viva Madero" two young Mexican lovers, Carmen and Julian, become engaged and Julian's employer, one Del Real, offers them a wedding fiesta. Unknown to Julian is the fact that Del Real is the leader of a gang scheming to get possession of the gold mines of the peons, with the aid of an unscrupulous judge, Alvarez, and under the protection of Dictator Diaz. Believing Carmen's father, Don Pancho, to be the owner of a rich mine, Del Real sends for him and, during their interview, Don Pancho denies owning any mine but exposes his knowledge of the crooked pursuits of the gang. Del Real instructs his henchman, Gutierrez, to kidnap Don Pancho's beautiful daughter, whom he has heard described but has not seen, placing the old man in their power. Neither Del Real nor Gutierrez is aware that Julian's betrothed is Don Pancho's daughter. Carmen arrives, marries Julian, and they make their home on the plantation. Del Real falls in love with her and makes advances which she repulses. Meanwhile Gutierrez goes with federal soldiers to her parents' home, fails to find her and kills both her parents. A peddler, who had previously learned from Don Pancho the true character of Del Real, reports the slaying of her parents to Julian and Carmen. Julian has received word from his friend, Don Jorge, that General Madero is going to head a revolution to rid the country of Diaz, and Julian agrees to lead a small army of peons, who have become devoted to him, against the federals, upon Don Jorge's promise to send him ammunition. Del Real and Gutierrez make an attempt on Julian's life and Julian kills both and leads the peons into the mountains, taking Carmen and other women. She becomes ill and he sends her with the peddler to Mexico City for medical care. Julian's band is victorious in several encounters with federal soldiers and finally succeeds in taking the city of El Rosario, and General Madero makes Julian "General" Teran. Julian then goes to join Carmen, who has borne him a son.

The evidence showed that the film, "Viva Cisco Kid" and the film, "The Cisco Kid and the Lady" were produced and exhibited by defendant, 20th Century Fox Film Cor-

poration. A summary is necessary to determine the rights of the parties.

In "Viva Cisco Kid" the scenes are laid in a typical western town and surrounding country. Cisco and his companion, Gordito, rescue a young woman, Joan and others being held up in a stagecoach and Cisco becomes interested in the girl, who has come to visit her father, Allen, a member of a holdup gang headed by Gunther, and bossed by a desperado posing as a miner with headquarters near an abandoned mine. Joan is innocent of knowledge of her father's activities, but he confesses to her, upon returning from robbing the Express office of the gold which his gang failed to discover in their holdup of the stagecoach, and she persuades him to flee and to mail back the money to the Express Company and promises to join him at a designated place when she gets a horse. Cisco and Gordito later encounter Joan, who has lost her horse; the crooked sheriff's posse arrives and arrests Cisco for the robbery but Joan confesses that her father is guilty but intends to return the money to the Express Company. The bandits take Joan with them to the hideout and lock her in a cellar. Cisco meets Allen; tells him of Joan's plight. Cisco and Gordito get information from Allen, take the money and go to the rescue of Joan while Allen waits for them. Cisco ingratiates himself with the boss, who invites him to remain overnight and join the gang. In an attempt to rescue Joan at night, the gang arrives with Allen and the boss prepares to destroy all four, but instead the falling beam intended to crush them, falls on him and his gang, trapping them, and Cisco, Gordito, Allen and Joan escape.

In "The Cisco Kid and the Lady" the locale is typical western country, early days. Riding through the country Cisco and Gordito collect posters showing various outlaw faces all bearing the same name, "Cisco", and wanted for numerous crimes. They hear shots, rescue an infant in a wagon, the driver of which is shot from ambush. The dying man, father of the infant, tears in three pieces his map of a gold mine, giving one each to Cisco, Gordito and Harbison, (hold-up leader) upon their promising to care for the child and share the gold with it. A newly arrived school teacher takes the child into her home to care for it and Cisco provides money. A dance-hall girl, Billie, in whom

Harbison is interested, falls in love with Cisco, recognizing him as the real Cisco. She steals Harbison's piece of the map and hides it in her locket. Cisco sees the theft from the window, enters the room, makes love to her and takes her locket. Discovering its absence she reports him to Harbison and he is thrown in jail with Gordito and Tommy, the fiance of the school teacher. Before his incarceration, Cisco has placed the locket with map inside on the doorsill of the dancer, who finds it there and, believing Cisco innocent, regrets her action and decides to free him. She passes a gun through the jail window and advises him to make his escape after midnight when the guard will be changed and she will provide saddled horses. Harbison enters the jail and Cisco makes a deal with him: Harbison is to rob the stage dressed in clothing which Cisco has left in his room. With Cisco in jail, it will be obvious that he did not commit the crime, Harbison will have the money, and Cisco will go free. At midnight Cisco, Gordito and Tommy make good their escape, take a justice of the peace to the school teacher's home to marry her to Tommy, and the newlyweds promise to take care of the baby. Cisco gives his share of the mine to them. Harbison, still wearing Cisco's clothes, is recognized and shot. Billie appears again and the picture ends with Cisco, Gordito and Billie riding off to new adventures.

The evidence showed that "En Tiempos De Don Porfirio" was produced and exhibited by the defendants, Grovas Oro Films, a Mexican company, and Azteca Film Distributing Co.

In "En Tiempos De Don Porfirio" the locale is old Mexico. Don Francisco de la Torre, who has inherited money, and Don Ridrigo Rodriguez Eje, proprietor of a gambling casino, engage in gambling and the latter wins all of Don Francisco's money. Don Francisco forgets his wedding plans and loses his intended bride, whose mother sends her to Paris where she marries her rich uncle and eventually gives birth to the child of Don Francisco; both of them are well provided for by the foster-father. A faithful maid keeps Don Francisco informed of the activities of Carlota and her daughter, Carmen, and, upon their return home arranges for him to see the girl, now eight, for the first time. The maid arranges for the girl and her father to meet from time to time. To the

girl these brief encounters seem accidental, but the father has taken a great interest in her happiness. After the death of her foster-father, her mother attempts to force her into a marriage with the elderly casino-proprietor, now wealthy. Don Francisco learns of this and also that Carmen cares for another, his godson. He carries through successfully several schemes to bring together the two young people, but the mother plans the wedding of her daughter to Don Rodrigo and so, to prevent it, Don Francisco plies Don Rodrigo with liquor at a dinner which he gives, gets him intoxicated and puts him to bed so that he does not appear for the wedding. A gossip remembers the experience of Carlota, and Carmen learns that Don Francisco is her real father. The godson Fernando, goes to the home of Don Francisco and finds the two asleep. Upon awakening Don Rodrigo, Don Francisco informs him that he must fight a duel with Fernando, and the casino proprietor is terrified. At the appointed place, at dawn, the signal is given and the two duelists walk in opposite directions but Don Rodrigo keeps on retreating and jumps into his carriage and leaves. The women arrive on the scene and the young couple embrace and Don Francisco and Carlota are re-united.

The defendant, Twentieth Century-Fox Film Corporation, delivered to the plaintiff for inspection, and plaintiff introduced in evidence, a large number of treatments of the film plays, "The Cisco Kid and the Lady" and "Viva Cisco Kid" under various titles, before the shooting script was completed. The shooting scripts of both films were also delivered to the plaintiff and introduced in evidence. Among the treatments prior to the final shooting script, were:

"The Adventurer" Outline Treatment, June 17, 1939, by Robert Yost and Arthur Lewis

"The Adventurer" Continuity Treatment, July 1, 1939, by Stanley Rauh and Arthur Lewis

"The Adventurer" Outline Treatment, July 6, 1939, by Stanley Rauh

"The Adventurer" (Cisco Kid) Complete Treatment, by Wilson Collinson July 15, 1939

"The Adventurer" (Cisco Kid) Screenplay by Frances Hyland July 22, 1939

"The Cisco Kid in Chicago" by Leonard Hoffman Sept. 7, 1939

"Cisco Kid"–No. 2, First Draft Screenplay by S. G. Engel and Hal Long, Oct. 3, 1939

"Romance in New York" Topical Notes, by Leonard Hoffman Aug. 16, 1939

"The Adventurer" Screenplay by Frances Hyland August 26, 1939

"Romance in Chicago" by Leonard Hoffman August 28

The defendant, Grovas Oro Films, introduced in evidence the shooting script of the film: "En Tiempos De Don Porfirio" in the Spanish language and, by stipulation and agreement of all parties, an interpreter was selected to interpret this story to the court. In addition, the court had the advantage of seeing the three films: "En Tiempos De Don Porfirio", "The Cisco Kid and the Lady", and "Viva Cisco Kid" projected on the screen.

A lengthy citation of cases would serve no useful purpose. Two opinions dealing with copyright infringements thoroughly cover the principles of law involved. In Harold Lloyd Corporation et al. v. Witwer, 9 Cir., 65 F.2d 1, Circuit Judge Wilbur writes an exhaustive opinion, and Circuit Judge L. Hand, in Sheldon v. Metro-Goldwyn Pictures Corporation, et al., 2 Cir., 81 F.2d 49, also thoroughly covers the subject. In these two opinions will be found the leading cases. Circuit Judge Wilbur held that the silent photoplay entitled "The Freshman" did not infringe the copyrighted story written by H. C. Witwer entitled "The Emancipation of Rodney". A vigorous dissenting opinion was written by District Judge Paul J. McCormick. The opinions cover over 47 pages.

Circuit Judge L. Hand, in the Sheldon case, held that the picture play, "Letty Lynton", was an infringement of Sheldon's "Dishonored Lady". The Sheldon case was again before the Circuit Court in 2 Cir., 106 F.2d 45, and was before the Supreme Court in Re Sheldon v. Metro-Goldwyn Pictures, et al., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825. The court, speaking through Chief Justice Hughes, reviewed the question of damages alone, and limited its decision to an interpretation of section 25(b) of the Copyright Act, 17 U.S. C.A. § 25(b), and set at rest the long debated question of damages for copyright infringement.

138

In order to establish infringement of a copyright there must be a "substantial reproduction of an original, using such original as a model, as distinguished from an independent production of the same thing, and a copy is that which comes so near to the original as to give to every person seeing it the idea created by the original, and must be such that ordinary observation would cause it to be recognized as having been taken from the work of another. Complete identity between the original and the copy is not essential to constitute infringement". 18 C.J.S., Copyright and Literary Property, 215, § 94 and cases cited. There must be appropriated a substantial portion of the copyright matter so that it definitely appears that the work of the author is made use of. Roe-Lawton v. Hal E. Roach Studios, D.C., 18 F.2d 126.

" 'Copyright infringement' is tort, committed only by copying substantial part of copyrighted material". Frankel v. Irwin, D.C., 34 F.2d 142.

"There can be no infringement unless there has been a copying either in whole or in part of the copyrighted work. Some copying is necessary to constitute infringement." Harold Lloyd Corporation et al. v. Witwer, 9 Cir., 65 F.2d 1, 4; 18 C.J.S., Copyright and Literary Property, 216, § 94.

"While it is not necessary that all or even a large portion of the work be copied, a substantial part of it must have been copied, although it is generally immaterial what proportion of defendant's work is copied from plaintiff's work, or that it is an improvement on such work". 18 C.J.S., Copyright and Literary Property, 218, § 94.

"Similarity is question of fact to be determined by comparison of copyrighted work with alleged infringing work." Hirsch v. Paramount Pictures, D.C., 17 F.Supp. 816.

"The test to be applied in all such comparisons as this is that of a library rather than that of the dissecting room—namely—the effect on the imagination of the judge of a comparative reading of the works in question." Eisman v. Samuel Goldwyn, Inc., D.C., 23 F.Supp. 519, page 520. Frankel v. Irwin, supra.

"In suit for infringement of common-law copyright to unpublished manuscript by defendant's moving picture play, even if episode in play was suggested by similar episode in manuscript, that fact did not constitute any basis for decree for plaintiff where episode in manuscript was merely glanced at as a supposedly comic accretion to the story and was not intrinsic to development thereof." Caruthers v. R. K. O. Radio Pictures, Inc., D.C., 20 F. Supp. 906.

"One work does not violate the copyright in another simply because there is a similarity between the two, if the similarity results from the fact that both works deal with the same subject or have the same common sources." Affiliated Enterprises v. Gruber, 1 Cir., 86 F.2d 958, 961.

"Copyright owner is entitled to protection not of his ideas, but in his expression or illustration thereof." Ansehl v. Puritan Pharmaceutical Co., 8 Cir., 61 F.2d 131, 132, certiorari denied 287 U.S. 666, 53 S.Ct. 224, 77 L.Ed. 374.

It is well settled that ideas, phrases and ordinary English idioms or words are not protected by copyright. Park v. Warner Bros., D.C., 8 F.Supp. 37.

See, also, cases under § 113-b, 18 C.J.S., Copyright and Literary Property, page 231, in re use of mechanical devices or motion pictures for unauthorized performances.

The court has examined carefully and in detail all of the material submitted. While the ultimate test of infringement must be the motion picture film as actually produced, and exhibited, yet the court permitted the plaintiff to introduce the various early treatments referred to in this opinion to determine whether there was any similarity between plaintiff's literary composition and the films. The court finds no similarity in the various treatments, the shooting script, or the two films, "The Cisco Kid and the Lady" and "Viva Cisco Kid" or between the stage play and the screen scenarios.

A sufficient summary of the films, as well as of the plaintiff's work, has been set forth in this opinion and further comment is unnecessary. The court is not able to find a single similar situation or a similar expression or scene. The plot, the sequences, the climaxes and the general stories are entirely different.

The same dissimilarity is at once apparent in reading the synopsis of "En Tiempos de Don Porfirio"; the film was a true representation of the synopsis. In view of the complete summary of this film

as set forth in this opinion, no further analysis should be necessary to show that the film and the plaintiff's work have nothing in common. Dezendorf v. 20th Century Fox Film Corporation, D.C., 32 F. Supp. 359, affirmed, 9 Cir., 118 F.2d 561, March 20, 1941.

The court finds that there was no evidence of any kind to show access to the plaintiff's manuscripts on behalf of Azteca Film Distributing Co. or Grovas Oro Film Co. Inc., and the testimony by which the plaintiff attempted to show access on the part of 20th Century Fox Film Corporation, was through the defendant, Sue Carol. The testimony showed that the plaintiff did deliver his manuscript and a synopsis of it to Sue Carol & Associates, Inc. An employee of this corporation testified that the manuscripts were locked in a drawer by himself and that no one but himself had access to them; that he read a portion of the scenario sometime between November 27, and December 4th in 1939; that he also saw a synopsis of said scenario on or about January 12, 1940, that plaintiff and said corporation entered into an agreement whereby the corporation became plaintiff's agent but this agreement was terminated about the 4th day of December, 1939, by mutual consent and that the corporation never delivered the manuscripts or synopsis to anyone, and that only one employee of the corporation ever saw them or read any part of them.

The plaintiff testified to a conference in an apartment house in Hollywood, at which time he read his play to defendants, Virginia and Eddie Kaye and two individuals entirely unconnected with the motion picture industry or any of the studios, but there was no testimony to show that either the 20th Century Fox Film Corporation or Azteca Film Distributing Co., or Grovas Oro Film Co. Inc. were represented at this conference, or directly or indirectly secured from this conference access to the plaintiff's scenarios or plot.

Under the facts as found by this court, even if access were shown, the plaintiff could not prevail, as the court finds that there has been no copying of the plot, or the incidents, characters, situations or any of the copyrighted features of plaintiff's motion picture scenario or play. Kustoff v. Chaplin, D.C., 32 F.Supp. 772; Harold Lloyd Corporation et al. v. Witwer, supra; Lynch v. Warner Brothers Pictures, Inc., D.C., 32 F.Supp. 575; Dellar v.

Samuel Goldwyn, Inc., 2 Cir., 104 F.2d 661; Bein v. Warner Brothers Pictures, Inc., 2 Cir., 105 F.2d 969; Collins v. Metro Goldwyn Pictures Corp., 2 Cir., 106 F.2d 83; Moore v. Ford Motor Co., D.C., 28 F.2d 529; Underhill v. Belasco, D.C., 254 F. 838

The bill will be dismissed and judgment will be entered for each of the defendants against the plaintiff, with costs. 17 U.S.C.A. § 1 et seq.

Section 40 of the Copyright Act provides the court may allow reasonable counsel fees to the defendant. The request of defendants for counsel fees will be denied under this section. Lowenfels v. Nathan, D.C., 2 F.Supp. 73; Shipman v. R. K. O. Radio Pictures, Inc., D.C., 20 F. Supp. 249; Caruthers v. R. K. O. Radio Pictures, Inc., D.C., 20 F.Supp. 906; Ornstein v. Paramount Productions, Inc., D. C., 9 F.Supp. 896.