Leo **FULD**, Plaintiff,

v.

**NATIONAL BROADCASTING COMPANY, INC. and NBC Television, Network, Defendants.**

**No. 74 Civ. 5000.**

United States District Court,
S. D. New York.

March 6, 1975.

---

Warren Moskowitz, New York City, for plaintiff.

Coudert Brothers, New York City, for defendant, National Broadcasting Co., Inc. by Carleton G. Eldridge, Jr., New York City, of counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

This is a copyright infringement action, in which defendant National Broadcasting Company, Inc. ("NBC") is alleged to have infringed plaintiff's copyright on his script entitled "Bugsy" by their broadcast of the television movie "The Virginia Hill Story" on November 19, 1974. The allegedly infringing film had been acquired by NBC's west coast offices from RSO Films, Inc. ("RSO"), an independent film producer, in late 1974 and was broadcast over the NBC television network by 200 affiliated stations throughout the country. Although plaintiff's copyrighted script was never published or produced, it was submitted—unsolicited—to NBC's east coast offices in February, 1974, in the hopes that NBC would purchase and produce it. Plaintiff's hopes were not realized and on March 19, 1974 NBC rejected his submission.

On the eve of the scheduled telecast of "The Virginia Hill Story", plaintiff applied for a preliminary injunction to halt the broadcast. After a hearing, the motion was denied on the ground that plaintiff's remedy at law was adequate.

Defendant now moves for summary judgment, on the ground that the lack of similarity between the two works is so striking as to warrant dismissal of the complaint on the merits. For the purposes of this motion only—and so as to avoid any questions of fact—defendant has conceded access. We must assume, therefore, that defendant (or its writers) had plaintiff's work before them when they created and produced "The Virginia Hill Story". Viewing defendant's admission of access in a light most favorable to plaintiff, we shall further assume that plaintiff's script was the sole source of ideas used by defendant, and that, prior to reading plaintiff's script, neither defendant nor any of its writers had ever heard of "Bugsy" Siegel or Virginia Hill.

For the reasons set forth below, the defendant's motion for summary judgment is granted and the complaint is dismissed.

Plaintiff's script—copyrighted in 1973—is the story of the life and death of Benjamin "Bugsy" Siegel, the notorious gangster who began his career in the rackets as a hired gun, was later promoted to run the syndicate's west coast operations, and was finally assassinated by rival gangsters in 1947 in the Beverly Hills home of Virginia Hill. The story centers entirely on "Bugsy" Siegel. It opens in the present with a family arriving in Las Vegas on a vacation and learning from a chance acquaintance, one Frail Flynn, that the Las Vegas of today was "the dream of one man alone", Benjamin "Bugsy" Siegel. The rest of the story is devoted to developing Siegel's life through a series of flashbacks. In broad outline, we learn: Siegel hated the name "Bugsy", preferring instead to be called "Ben"; he was a gangster with a driving ambition to establish a legitimate—albeit mob financed—casino in Las Vegas; like most people who deal in gangster financed projects, he continually needed money

and got in deeper and deeper with the syndicate; when his casino was finally ready, its opening night was a disaster, the people Siegel had expected to come from all over the world never showing up; when the casino finally made a comeback, the mob decided to move in on Siegel and proposed to take over the casino, giving him a job as manager; when he refused, he was executed by the mob. Throughout the period of his life covered by this development, he meets—on a first name basis—almost all the notorious gangsters of the day: "Lucky" Luciano, Joe Adonis, Meyer Lansky ("Morris Rusky" in plaintiff's script), Joe Epstein, "Dutch" Schultz, Louis "Lepke" Buchalter, to name a few. Virginia Hill does not appear until about two-thirds of the way through the story. Siegel—who at the time is based in California—comes to New York on one of his numerous attempts to obtain mob money, and is introduced to Virginia by Joe Adonis. From stage directions inserted at this point in the script, we learn that Virginia has been consorting with gangsters since as a teenager she left Alabama for Chicago, where she was befriended by one Joe Epstein, a bookmaker. "Bugsy" and Virginia fall in love immediately and are in bed together within two hours. She follows him back to California and a turbulent love affair ensues, characterized by violent arguments and passionate reconciliations. At one point she leaves him and establishes her own home in Beverly Hills, but upon his urgent pleading—expressed among other ways, in love letters laced with poetry—returns to him. Eventually, they sneak off to Mexico and are secretly married. Upon returning, Siegel devotes himself full time to the building of the casino, to the detriment of his health. When the casino finally begins to prosper, Virginia pleads with him to save his health by chucking it all and fleeing with her to Europe. Annoyed at his refusal to follow her advice, she goes to Europe by herself.

Her precipitous departure arouses the mob's suspicions and is a contributing cause of their decision to eliminate him. The assassination takes place in Virginia's Beverly Hills' home. The story ends with Frail Flynn extolling the virtues and attractions of Las Vegas and Siegel's voice reading his last love letter to Virginia.

Defendant's film—like plaintiff's script—begins and ends at one point in time and is mostly devoted to flashbacks. Unlike plaintiff's work, however, it centers on Virginia Hill and uses "Bugsy" Siegel as a foil to the development of her character. The film opens in 1951 at the famous Kefauver hearings. She is on the witness stand telling of her life, and the flashbacks concern the recollections evoked in her by the interrogation. She is first seen as a poor Kentucky girl who leaves home with her adopted "brother" Chick ("Leroy" in the film)[1] to escape degrading poverty and an irascible father. While working as a waitress in Chicago, she meets the bookmaker Epstein ("Leo Ritchie" in film), who promises her furs and fancy dresses in return for her companionship. She insists that he must also provide for Leroy, to which he agrees. Virginia and Leroy are introduced to Ritchie's gangster associates and are induced to run mysterious midnight errands for the syndicate. Although Virginia realizes somewhat the significance of these associations, she tries to shield Leroy from the implications of their involvement. After returning to Chicago from a visit back home, Virginia—apparently under the influence of the contact with her grandmother—decides to change her mode of life and leave Ritchie. But it is too late. Leroy—unknown to her—has become deeply involved in underworld activities, and Meyer Lansky ("Nick Rubanos" in film) threatens to destroy Leroy unless she follows his instructions. He sends her to California where —at a salary of $2,000 a week—she is

---

1. The brother who—as will be seen—plays a significant part in defendant's film is not mentioned in plaintiff's script.

instructed to keep an eye on the mob's west coast affiliates and to report back any and all information she obtains, particularly any information on Siegel (whom she has not yet met). She buys an expensive home in Beverly Hills and throws lavish parties, to which she invites mobsters and movie stars alike. When Siegel finally shows up at a party, the two of them are magnetically drawn to each other. They leave the party and go first to a nearby beach and then for an automobile ride to the desert outside Las Vegas, where Siegel confides in her his burning ambition to build a casino which will attract customers from all over the world. She agrees to help him, casually referring to him as "Bugsy". He angrily corrects her, warning her that his name is "Ben" and to never again call him "Bugsy". It is left to the imagination whether—and if so how—they wind up in bed on their first evening together. However, it is clear that they are in love. He moves in with her and together they work feverishly on the casino. Their relationship proceeds tranquilly until Siegel overhears her on the phone with Rubanos, relaying information on the progress of the casino's construction and denying any wrongdoing on Siegel's part. After she hangs up, she confesses to Siegel that she works for Rubanos and has for a long time. Siegel is infuriated and stalks out of the house—only to return in a few hours. A few nights later, upon returning home from a day at the race track, they find Leroy badly beaten up—as a warning from the mob. Now Virginia is really frightened and demands to know where all the mob's money has gone. Siegel reassures her that it has all been invested in the casino and that the casino will be a tremendous success. He is confident that he will become known as "the man who invented Las Vegas" and that she will be famous as "the woman who invented the man who invented Las Vegas." He then hints at the possibility of their getting married in Mexico, and her resistance dissipates. However, on the casino's opening night, she receives

a threatening phone call from Rubanos, demanding to know where a certain $650,000 of mob money has gone. To make matters worse, the opening night is a fiasco—none of the world-wide customers Siegel had been expecting show up. In the debacle that follows, Siegel and Virginia have a violent argument, which ends with Virginia swallowing sleeping pills. When she awakens in the hospital, Siegel is there to apologize. He promises to take her to Europe as soon as the casino is in the black. Before they can leave, however, Rubanos pays Siegel a visit and threatens to kill him unless he turns the casino over to the syndicate. He refuses to do so, confident that the mob will not carry out their threats. A few weeks later, Virginia—unable any longer to live with her terror of the mob—leaves for Paris, where he plans to join her. That night, while Siegel is awaiting a phone call from Virginia—which, incidentally, is the only way they communicate when apart from each other—he is assassinated. Leroy finds his body and telephones Virginia to tell her the dreadful news. The camera then returns to the Kefauver hearings, which are now at an end and Virginia is excused. Afterwards, she pays one last visit to her Beverly Hills mansion, which is being auctioned off by the government to pay for her back taxes. As she stands unobtrusively in the background, the auctioneer is seen selling off her belongings, including a ring she had given Siegel on the casino's opening night. When she tries to buy it back, she finds she cannot afford it, and Leo Ritchie—who has been standing watching her all along—steps in and buys it for her. The picture ends with her walking away from the house, and a notation that she took her own life in 1966.

Assuming—as we do for the purposes of this motion—that neither defendant nor its writers had ever heard of Virginia Hill or "Bugsy" Siegel before reading plaintiff's script and that such reading was the genesis of the idea of producing defendant's movie, it is at

once apparent that plaintiff can claim credit for much of the information conveyed in the movie. Virginia's impoverished southern background; her migration to Chicago; her relationship with the bookmaker Epstein; her turbulent love affair with "Bugsy" Siegel which involved an actual or contemplated secret marriage in Mexico and which ended in separation when she went to Europe; Siegel's hatred of the name "Bugsy"; his consuming passion to establish a gambling casino in Las Vegas, which would draw customers from all over the world; his obtaining gangster financing to further that ambition; Meyer Lansky's threat to kill him, and his ultimate execution by the mob.

It is on these "similarities" that plaintiff bases his claim of copyright infringement. Such claim, however, faces two insurmountable obstacles. First, the ideas or information in question were given entirely dissimilar treatment in defendant's movie. Second, such ideas and information were—with minimal exceptions—by no means original with plaintiff but rather constituted historical fact or previously published fictional material.

■■ With respect to the first obstacle, it is axiomatic that a copyright does not protect its owner from the use by others of the ideas, themes, locale or characters in his copyrighted work. Dellar v. Samuel Goldwyn, Inc. (2d Cir. 1945) 150 F.2d 612; Shipman v. R. K. O. Radio Pictures (2d Cir. 1938) 100 F.2d 533; Nichols v. Universal Pictures Corporation (2d Cir. 1930) 45 F.2d 119; Dymow v. Bolton (2d Cir. 1926) 11 F.2d 690; Rush v. Oursler (S.D.N.Y.1930) 39 F.2d 468; Eichel v. Marcin (S.D.N.Y. 1913) 241 F. 404. It is only the means of expression of those ideas and themes —or manner of use and development of those characters—that is protected. *Id.*

Illustrative of this principle are the cases holding that where two stories deal with the same general subject matter, similarities of names, events and locales are without legal consequence. Funkhouser v. Loew's Inc. (8th Cir. 1953) 208 F.2d 185, cert. den., 348 U.S. 843, 75 S.Ct. 64, 99 L.Ed. 700 (1954); Harold Lloyd Corporation v. Witwer (9th Cir. 1933) 65 F.2d 1; McCaleb v. Fox Film Corp. (5th Cir. 1924) 299 F. 48; London v. Biograph Company (2d Cir. 1916) 231 F. 696; Costello v. Loew's Inc. (D. D.C.1958) 159 F.Supp. 782; Lake v. Columbia Broadcasting System (S.D.Cal. 1956) 140 F.Supp. 707; Caruther's v. R. K. O. Radio Pictures, Inc. (S.D.N.Y. 1939) 20 F.Supp. 906. As observed by the court in DeMontijo v. Twentieth Century-Fox Film Corp. (S.D.Cal.1941) 40 F.Supp. 133, 138,

> "one work does not violate the copyright in another simply because there is a similarity between the two, if the similarity results from the fact that both works deal with the same subject or have the same common sources."

Against that background, it is evident that defendant's movie could not possibly be found to infringe plaintiff's script. Every idea or bit of information common to both works received strikingly different treatment in movie and script. Take, for example, the love affair between Virginia and "Bugsy". In plaintiff's script it constituted primarily a series of unpremeditated rolls in the hay, Virginia's sole function being to satisfy "Bugsy's" over-powering *machismo* need for sexual gratification.[2] When they separated, it was always she who left—for no particular reason except that she was tired of his abuse— and when she finally went off to Europe it seems to have been because of petulant annoyance with his sense of priorities. In the movie, on the other hand,

---

**2.** The true character of their relationship is aptly illustrated by one of Siegel's letters in which, in urging her to come back to him, he writes: "Last night on the phone you murmured something about [returning in] a month . . . You know I can't be without a woman!!! What are you made of that for a whole month you want me to suffer this hell? This HELL of having to caress someone I don't love . . . ."

the love affair was primarily *her* grand passion, which matured and was shattered under the omnipresent fear of the mafia. It was not she but he who caused their first separation, and he left her not because of petulance but because of his outrage upon discovering that she had been a syndicate agent assigned to spy on him—which fact she had concealed because of her terror of her underworld employers. The final separation brought about by her flight to Europe was occasioned not by annoyance with "Bugsy" but by that very same terror.

With respect to the second obstacle, it is also axiomatic that a copyright protects only matter which is original with the owner—and that it is impossible to copyright historical facts or fictional material previously published by others. O'Brien v. Chappel & Co. (S.D.N.Y.1958) 159 F.Supp. 58; Pinci v. Twentieth Century-Fox Film Corp. (S.D.N.Y.1951) *95 F.Supp. 884. The rule of law that historical facts are in the public domain, and thus available to any writer who may wish to use them as a medium, was eloquently elaborated upon by Learned Hand as follows:

> ". . . not only are all the facts recorded in a history in the public domain, but, since the narration of history must proceed chronologically,—or at least, such is the convention—the order in which the facts are reported must be the same in the case of a second supposed author. There cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection, although into that selection may go the

highest genius of authorship, for indeed, history depends wholly upon a selection from the undifferentiated mass of recorded facts." Myers v. Mail & Express Company, 36 C.O.Bull. 478, 479 (S.D.N.Y.1919) (unreported). Cited in Norman v. Columbia Broadcasting System, Inc., 333 F. Supp. 788 (S.D.N.Y.1971)

Defendant has provided us with a list of books[3]—published prior to the date of plaintiff's copyright—in one or more of which all of the alleged similarities[4] cited by plaintiff—with minimal exceptions—appear.

Nor is there any merit in plaintiff's claim that infringement can be established by defendant's use of certain dramatic techniques employed in its script. These alleged similarities in techniques include the use of flashbacks and of Virginia and Siegel as starcrossed lovers upon whose tragedy the plot is hung. In the first place, there is nothing original about either technique (or of any other found in plaintiff's script), and in the second place these techniques are employed with entirely different effect in defendant's movie. With respect to the flashbacks, plaintiff's Frail Flynn is just a convenient way of opening and closing the story. The Kefauver hearings have quite a different purpose in defendant's movie. They intermittently emerge as the story unfolds, always with the purpose (and sometimes the effect) of highlighting Virginia's character development.

In brief, the record before us can aptly be described in words used by our Court of Appeals over a generation ago

---

3. Jennings, Dean, "We Only Kill Each Other—The Incredible Story of Bugsy Siegel—Mobster" (1967); Reid, Ed, "The Mistress of the Mafia—The Virginia Hill Story" (1972); Reid—Ed, "The Grim Reapers" (1969), Reid, Ed and Demaris, Ovid, "The Green Felt Jungle" (1963).

4. Plaintiff originally listed 18 points of similarity, based on a comparison of his script with the defendant's original two scripts. Seven of the allegedly similar scenes or phrases were, however, not incorporated in

the film as shown on television. Since the ultimate test of infringement must be the television film as produced and broadcast—and not the preliminary scripts—we have confined our analysis to the remaining eleven allegedly similar scenes which were in the film as produced and broadcast. DeMontijo v. Twentieth Century-Fox Film Corp. (S.D. Cal.1941) 40 F.Supp. 133, 138. The claimed similarities in the two original scripts would, of course, be relevant if access were at issue. Nimmer on Copyright, Vol. 2, p. 619.

in Dellar v. Samuel Goldwyn, Inc., *supra*, 150 F.2d at 613,

"[This] action as a whole has been built up, partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." (per curiam opinion of Judges L. Hand, A. Hand and Clark.)

Defendant's motion for summary judgment is granted and the complaint is dismissed as to both National Broadcasting Co., Inc. and NBC Television Network, the latter not being an entity separate and distinct from the former.

So ordered.