Neil F. COMINS, Plaintiff

v.

DISCOVERY COMMUNICATIONS, INC. and York Films Ltd. Defendants

No. CIV.PJM 00–1411.

United States District Court, D. Maryland.

March 28, 2002.

Jerry L. Squires, Washington, DC, for plaintiff.

Lee J. Levine, Washington, DC, for defendants.

## OPINION

MESSITTE, District Judge.

Plaintiff Neil F. Comins ("Comins") alleges that Defendants Discovery Communications, Inc. ("Discovery") and York Films Ltd. ("York") infringed his copyright in a book entitled *What If The Moon Didn't Exist?* ("the Book") through their production and telecast of a documentary film entitled *If We Had No Moon* ("the Film"). He also alleges that Defendants violated the Lanham Act, 15 U.S.C. § 1125, and committed the common law tort of misappropriation by including his name at the end of the Film in a list of individuals and entities to whom the producers wished to give "thanks." Defendants have moved for summary judgment on all of Comins' claims. Having considered the parties' pleadings and oral arguments and having reviewed the works in question, the Court will GRANT Defendants' Motion.

## I.

The salient facts are these:

Plaintiff Neil F. Comins is a Professor of Astronomy and Physics at the University of Maine, where he has taught since 1978. He has written numerous articles, as well as a college text, on astronomy. Discovery is a Maryland corporation that engages in, among other things, the production and distribution of programming shown on The Discovery Channel. York is a television production company located in the United Kingdom.

Comins alleges that in the Fall of 1997, York sought and obtained from him a copy of the Book for the "express purpose of creating a documentary television program." He attempted to pursue discussions about the use of his work with York's representative, Raili Taylor, in early December of 1997, but until Spring of 1998 received no response to his inquiries. In the interim, York also engaged in extensive discussions with Richard Longley of Fovea Productions about their possible joint production of a film. According to Comins, Longley informed him that he (Longley) and York were working toward the production of a film for Discovery based on Comins' Book. However, on June 19, 1998, in response to an e-mail inquiry from Comins, Taylor informed Comins that York had "put the project on ice" and thereafter, despite his inquiries, Comins received no communication from York.

During that time, according to Comins, Discovery and York violated his rights. He alleges that York took Longley's proposal, which was based on the Book, and

used it in preparing the program proposal that York ultimately presented to Discovery. He says that when Discovery gave its approval to the production of a film based on York's proposal and ultimately produced the Film, it bore the same title and basic content as in York's proposal. Neither Comins nor Longley had a role in the Film's production. Defendants concede that they had a copy of Comins' Book, but contend that they decided to pursue production of a film unrelated to the Book and that York submitted a proposal to Discovery based on independent research and creation.

## II.

■ To establish a claim for copyright infringement, a plaintiff must prove that he owns a valid copyright and that the defendant copied its original elements. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001). Since Defendants concede that Comins possessed and possesses a valid copyright in "What If The Moon Didn't Exist," the issue in this case is whether Defendants copied its original elements.

■ To establish copying, a plaintiff must show that the defendant had access to the copyrighted work and that the defendant's work is "substantially similar" to plaintiff's. *See Towler v. Sayles*, 76 F.3d 579, 582–83 (4th Cir.1996). Since Defendants have conceded that they had access to Comins' Book, the specific inquiry is whether the Film is substantially similar

to the Book. A determination of substantial similarity requires a "detailed examination of the works themselves." Accordingly, the Court begins by summarizing the works at issue. *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir.1996) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir.1986)).

### A.

### The Book

#### *(What If The Moon Didn't Exist?)*

Comins' Book is in ten chapters, each organized around a "What if?" question, purportedly inspired by a series of such questions posed to Comins by his young son. Comins asks these hypothetical questions in an attempt to illustrate "what the world would be like if its astronomical environment were different."

In each chapter of the Book, Comins posits one "astronomically plausible change" in the solar system, then describes "what the world would be like" if that change had actually occurred. He gives each hypothetical planet a different name (such as "Solon") and proceeds to describe that planet's atmospheric, geological and biological conditions and the extent to which these conditions would differ from those on Earth[1] as a result of the "astronomically plausible change" suggested at the beginning of the chapter. Each chapter assumes a new hypothetical condition, eliminating the hypothetical condition explored in the previous chapter, and in

---

1. The National Aeronautics and Space Administration (NASA) indicates that the names of celestial bodies, including "Earth (the planet)" as opposed to "earth (the ground)" should be capitalized, and indeed that "the Moon (Earth's)" should also be capitalized. Mary K. McCaskill, *Grammar, Punctuation, and Capitalization: A Handbook for Technical Writers and Editors*, NASA SP–7084 (1990), *available at* http://stipo.larc.nasa.gov/sp7084/.

However, according to *The Columbia Guide to Standard American English*, the name of our planet is "sometimes capitalized but not when 'the' is used with it." Kenneth G. Wilson, *The Columbia Guide to Standard American English* (1993), *available at* http://www.bartleby.com/68/5/2105.html. The Court will follow these guidelines in this Opinion except insofar as direct quotations from the pleadings of the parties do not.

the process creating a new hypothetical planet bearing a different name and featuring a different hypothetical condition. The title of each chapter indicates the various hypotheticals under consideration.

Chapter 1 is entitled "What If the Moon Didn't Exist? Solon." Chapter 2 is "What If the Moon Were Closer to the Earth? Lunholm." Chapter 3 is "What If the Earth Had Less Mass? Petiel." Chapter 4 is entitled "What If the Earth Were Tilted Lke Uranus? Urania." Chapter 5 is "What If the Sun Were More Massive? Granstar." Chapter 6 is entitled "What If a Star Exploded Near the Earth? Antar." Chapter 7 is "What If a Star Passed near the Solar System? Cerberon." Chapter 8 is "What If a Black Hole Passed Through the Earth? Diablo." Chapter 9 is entitled "Seeing the World Through Infrarose–Colored Glasses: Earth." And, finally, Chapter 10 is "From New Worlds to Our World: What If the Ozone Layer Were Depleted? Earth." Of the ten chapters of the Book, only two deal with the Moon and its relationship with Earth. Comins' claims of infringement in this case concern only these first two chapters.

In Chapter 1, the Book explores "some of the basic changes that would occur to the earth had the moon never formed." Among other things, Comins explains that it would have taken "hundreds of millions of years longer" for life to evolve on this moonless Earth. In Chapter 2, Comins reintroduces the Moon, but asks "What if the Moon Were Closer to the Earth?" On the hypothetical planet constructed in this chapter, he surmises that, among other things, the initial spread of life in the oceans would occur more quickly than on Earth, while the evolution of land animals would likely occur more slowly.

## B.

### The Film

#### (If We Had No Moon)

The Film is exclusively devoted to the Moon and its effect on the earth. It opens with the same sort of hypothesizing as the Book, with the narrator asking, "What if we had no moon?" He then describes how "the earth would be a very different place without the moon," quoting a scientist who suggests that, without the Moon, there would be no human beings.

The Film proceeds to feature brief appearances by leading scientists who have studied the Moon and its history. Addressing the "twin themes of the evolution of thought and matter," each scientist explains his or her theory about a particular phase of the Moon's development.[2] The viewer is thus exposed to cutting-edge scientific knowledge about the evolution of the Moon, at the same time learning about past theories pertaining to the Moon and why they have or have not survived.

The first scientist to appear in the Film is Dr. William Hartmann, developer of the "Giant Impact Theory" of the Moon's formation, whose work is generally acknowledged to be the foundation for virtually all subsequent research about the Moon. Hartmann discusses the three conventional theories regarding the Moon's formation and presents the reasons why he rejected all of those in favor of his own, which posits a collision between Earth and another planet roughly the size of Mars.

The next scientist who appears is Dr. Jay Melosh, who discusses how computer modeling helps to explain the consequences of the impact described by Dr. Hartmann. Melosh demonstrates how

---

2. In contrast, the Book features no interviews with scientists and is organized around hypothetical questions which are answered only in terms of the chronological.

such modeling leads to the conclusion that, following the planetary collision described by Hartmann, a massive blast of gas and debris escaped from Earth and went into orbit around it, providing the raw material that ultimately formed the Moon.

Dr. Robin Canup, who appears next, explains how she built upon existing knowledge to develop an impact model explicating how a single, large moon such as ours was produced.

The Film continues in this fashion, presenting other prominent scientists, each of whom discusses significant phases of the Moon's development. These scientists, drawn from multiple fields, including astronomy, orbital dynamics, rocket science, space architecture, geology, theoretical physics and evolutionary biology, discuss their own work as it relates to the Moon.

### III.

A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court construes all facts and draws all reasonable inferences from those facts in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Notwithstanding Comins' arguments to the contrary, summary judgment motions are "routinely granted" in copyright cases. 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.10[A], at 12–146 (2001). Specifically, "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Eaton v. Nat'l Broad. Co.*, 972 F.Supp. 1019, 1023 (E.D.Va.1997) (quoting *Warner Bros., Inc. v. Am. Broad. Co., Inc.*, 720 F.2d 231, 240 (2d Cir.1983) (internal quotations omitted)). A finding on either of these two grounds, the copying of non-copyrightable elements or lack of substantial similarity, involves essentially the same inquiry-*i.e.*, whether, in the eyes of the average lay observer,[3] the allegedly infringing work is substantially similar to that of plaintiff. *See Williams*, 84 F.3d at 587; *see also Kretschmer v. Warner Bros.*, 1994 WL 259814, *8 (S.D.N.Y.) ("The test for substantial similarity is whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.").

### IV.

The determination of substantial similarity involves two steps. First, "the court must determine whether the two

---

**3.** In the Fourth Circuit the "ordinary observer" to which the substantial similarity test refers is "to be a member of 'the intended audience of the plaintiff's work.' " *Lyons*, 243 F.3d at 801 (quoting *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 736 (4th Cir. 1990)). Thus, "when it is clear that the work is intended for a more particular audience [than the general public], the court's inquiry must be focused upon the perspectives of the persons who comprise that group." *Lyons*, 243 F.3d at 801. Since neither party has asserted a more specialized audience in this case, the Court will consider the general public to be the appropriate and intended audience for both the Book and the Film. Assessing Comins' claims from the perspective of an ordinary lay observer bears on the ultimate inquiry of "whether the works are so similar that the introduction of the alleged copy into the market will have an adverse effect on the demand for the protected work." *Id.* at 802.

works are 'extrinsically similar because they contain substantially similar ideas that are subject to copyright protection.'" *Lyons*, 243 F.3d at 801 (quoting *Towler*, 76 F.3d at 583). Second, "the court must ask whether the works are 'intrinsically similar' in the sense that they express those ideas in a substantially similar manner from the perspective of the intended audience of the work." *Lyons*, 243 F.3d at 801. "Extrinsic evaluation" focuses on the similarity between the two works' objective elements, such as plot, theme, characters, setting, pace, mood and dialogue. *Eaton*, 972 F.Supp. at 1026. "Intrinsic evaluation" requires an inquiry into whether the " 'total concept and feel' of the disputed work resembles that of the plaintiff's." *Id.*

■ In analyzing substantial similarity, this Court is guided by the proposition that the *sine qua non* of copyright is originality. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Thus, an author's copyright "is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Accordingly, the court must " 'isolate the protectable expression' in the copyrighted work in order to determine whether there are substantial similarities between that protected expression and the defendant's work." *Whitehead v. Paramount Pictures Corp.*, 53 F.Supp.2d 38, 47 (D.C.Cir. 1999) (quoting *Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir.1998)); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir.1994) ("[T]he party claiming infringement may place *no* reliance upon any similarity in expression resulting from unprotectable elements.") (internal quotation and citation omitted) (emphasis in original). One court recently listed the following as "unprotectable ele-

ments" that the court must filter out of its analysis:

> 'ideas,' as distinguished from the 'expression' of those ideas; facts, historical events, or other information over which no individual is entitled to claim a monopoly (though original compilations or arrangements of facts may be protectable); elements borrowed from another author or from the 'public domain'; instances in which a particular 'expression' at issue 'merges' with the 'idea' being expressed; and/or a similar instance in which the form of the 'expression' is so 'standard' in the treatment of a given 'idea' that it constitutes a *scenes a faire*, or a 'scene which must be done.'

*Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1176–77 (C.D.Cal.2001).

## V.

The Court applies these standards to the case at bar.

As an initial matter, the Court notes that Comins' proof of infringement consists of a list of some nineteen alleged similarities between the Book and the Film. The Fourth Circuit, however, has cautioned that such lists "comparing 'random similarities scattered throughout the works' [are] 'inherently subjective and unreliable.'" *See Towler*, 76 F.3d at 584 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir.1984)); *see also Eaton*, 972 F.Supp. at 1027 n. 13 (rejecting reliance on lists comparing "random fragments of dialogue, scenes, and characteristics"). Thus, "[i]nstead of relying on such scattershot lists," the district court must "closely analyze the two works at issue for extrinsic similarities." *Eaton*, 972 F.Supp. at 1027 n. 13; *see also Williams*, 84 F.3d at 590 (holding that a list of random similarities is not probative of substantial similarity "because it fails to address the underlying issue: whether a lay observer would consider the

works as a whole substantially similar to one another").

The Court concludes as a matter of law that virtually all of the similarities between the Book and the Film that Comins is alleging involve non-protectable elements. In the first place, despite the similarity of the titles of the two works (of the Book "What if the Moon Didn't Exist" and of the Film "If We Had No Moon"), titles are not copyrightable. *See, e.g., Parham v. Pepsico, Inc.*, 927 F.Supp. 177, 179 (E.D.N.C.1995). Beyond that, while Defendants may well have drawn some of the ideas in the Film from the Book, that fact in and of itself establishes no infringement. One of the fundamental principles of copyright law is that it protects the expression of an idea rather than the idea itself. *See Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954). "[A] copyright does not protect its owner from the use by others of the ideas, themes, locale or characters in his copyrighted work." *Fuld v. Nat'l Broad. Co.*, 390 F.Supp. 877, 881 (S.D.N.Y.1975).

Historical facts and events, of course, are not protected by copyright, *Gardner v. Nizer*, 391 F.Supp. 940, 942–43 (S.D.N.Y.1975), nor are interpretations of historical events. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir.1980). Thus, an historical interpretation, even if it originated with the plaintiff, is not protected by copyright and "can be freely used by subsequent authors." *Id.* at 979; *see also Idema*, 162 F.Supp.2d at 1183 ("[A]ny author is explicitly *allowed* to mine (even copyrighted) sources for *facts* which are described therein, so long as the later *depiction* of those facts does not infringe upon their expression in the source so consulted.") (emphasis in original); *Walker*, 784 F.2d at 49 (noting that copyright protection "does not extend to facts or to true events, even if discovered through original research"). The protec-

tion afforded works recounting historical facts or events has been described as "thin;" *i.e.*, less robust than that accorded original works of a fictional nature. *See Idema*, 162 F.Supp.2d at 1178.

Additionally, where "common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement." *Alexander v. Haley*, 460 F.Supp. 40, 45 (S.D.N.Y.1978); *see also Fuld*, 390 F.Supp. at 881 ("[O]ne work does not violate the copyright in another simply because there is a similarity between the two, if the similarity results from the fact that both works deal with the same subject or have the same common sources.") (citation omitted); *Greenbie v. Noble*, 151 F.Supp. 45, 66 (S.D.N.Y.1957) ("By drawing upon materials and information from sources available to all, an author does not thereby obtain the right to exclude others from using the same materials.").

Comins attempts to describe the Book as "some kind of hybrid work," mixing elements of a factual account with elements of a creative, literary work, but the Court is unpersuaded. In the Court's view, the Book is clearly analogous to other works describing historical persons and events, which courts have consistently afforded less protection than works of fiction. *See, e.g., Hoehling*, 618 F.2d 972 (book and film about the Hindenburg); *Greenbie*, 151 F.Supp. 45 (biography and novel about historical figure); *Fuld*, 390 F.Supp. 877 (script and movie about death of notorious gangster).

Comins next attempts to make out a claim based on the original expression contained in the Book. "York," he says, "took copyrightable expression from his Book, and incorporated in its Film, by virtue of the selection and organization of the facts and theories presented first in the Book,

and then in the Film, and then by having replicated, often in visual form, the expressive manner in which Comins presented the facts, theories and speculations in his book." The Court remains unconvinced. "[T]here cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection, although into that selection may go the highest genius of authorship, for indeed, history depends wholly upon a selection from the undifferentiated mass of recorded facts." *Myers v. Mail & Express Co.*, 36 C.O. Bull. 478, 479 (S.D.N.Y.1919) (Hand, J.). Comins' side-by-side comparison of the Book and the Film suggests only a similarity of facts and organization that would be logical in any work describing an historical event such as the evolution of the Moon.

Likewise, Comins cannot prevail on his claims of alleged similarities of phrases and sequences of events. These amount to nothing more than what are known as *"scenes a faire,"* that is, "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Hoehling,* 618 F.2d at 979 (quoting *Alexander,* 460 F.Supp. at 45). Such *scenes a faire* are not copyrightable as a matter of law. *See Hoehling,* 618 F.2d at 979. The Film visually and orally and the Book in written words depict certain events, such as debris striking the Moon and Earth and a slow-motion collision between Earth and another planet, accompanied by similar phrases that tell the story of the Moon's evolution. But to the extent there may be similarities of phrase or sequence between the two works in such instances, there is an obvious similarity in subject matter. Defendants could hardly be expected to change the sequence of events through which the Moon has evolved simply to avoid an appearance of similarity to the Book. At the same time, other similarities between the two works,

such as the fact that both discuss the Moon's effect on the menstrual cycles of living things on Earth, are ideas or theories well-established in the public domain and not subject to protection.

Non-protectability of the Book's elements aside, the Court also sees no way in which the Book and Film are extrinsically and intrinsically of a piece. Their dissimilarities run to plot, theme, dialogue, mood, setting, pace and sequence—the benchmarks of extrinsic comparisons—as well as to "total concept and feel" the measure of intrinsic similarity.

As to plot and theme, the Book hypothesizes an Earth without a moon or with a moon closer than it is. The Film, on the other hand, is a scientific discourse on the interrelationship of the Moon and the earth, depicting how the Moon was formed, the effect it has had and continues to have on the earth, and how scientific theories about the Moon and the earth have evolved over time.

The dialogue, mood, setting, pace and sequence of the Book are nothing more nor less than what they set out to bea dialogue with the reader, catering to his imagination about fantastic worlds that might exist if hypothetical conditions prevailed. The Film, in contrast, is a matter-of-fact scientific portrayal, proceeding in both chronological and logical fashion, addressing—as indicated—the Moon's formation, its interrelation with the earth and the evolution of scientific theories about the Moon. The Book's tale is told by a nameless storyteller whose credentials one is left to guess at, the Film's by a series of named scientists distinguished by their studies of moon science, all acknowledged by their peers to be the leading experts in the field. The Book's tone is pitched to an adult (or perhaps an intelligent child of the sort said to have inspired its writing), who perhaps wonders aloud while musing at

home. The Film, in addition to its interest for the general viewer, would be suitable for a college-level science class on astronomy.

All this speaks simultaneously to the issue of the intrinsic similarity of the works. The "total concept and feel" of the two works differ markedly. As just described, in "mood," "detail" and "characterization," these are distinctly dissimilar works. *See Williams v. Crichton,* 860 F.Supp. 158, 166 (S.D.N.Y.1994), *aff'd,* 84 F.3d 581 (2d Cir.1996). The Court concludes that, under no circumstances, could the intended audiences of the works reasonably determine that they were otherwise.

Finally, Defendants have demonstrated as a matter of law an independence of creation sufficient to rebut any presumption of copying.[4] *See Greenbie,* 151 F.Supp. at 65 ("The fact that two works relate to the same subject matter or are similar to one another does not constitute an infringement if each is the fruit of the author's independent intellectual effort."). York has presented extensive evidence of the literature it reviewed in the process of developing its program, as well as of the many interviews it conducted with scientists both off- and on-screen. It has shown how the Film's discussion of planetary formation, lunar formation and the conditions that obtained on Earth during those events were drawn directly from Dr. Hartmann, whose work clearly predates the Book. The same is true as to Dr. Melosh's characterization of the lunar-forming impact as having taken place as if in "slow motion." Melosh's work on this subject came well before the Book described it.

As for the Film's presentation of the Apollo lunar laser ranging experiments,

which measure the extent of the Moon's recession from the earth, this historical fact is not only not copyrightable; it is widely available from public sources, including NASA's website, which Defendants in fact consulted.

Continuing:

While the Book may well discuss the stabilizing effect that the Moon has on the earth's climate and the influence it has on the rotational speed of the earth, the published works of Drs. Darren Williams and Jacques Laskar, as consulted by Defendants, also describe these effects. Likewise, the Film's graphic depiction of changes in the obliquity of the earth and its climate as the Moon recedes derives from studies of Dr. Williams, also consulted by Defendants.

That the Moon has shielded Earth from impacts with space debris of the sort that may have led to the extinction of the dinosaurs is commonly known and has been widely reported. The same is doubly true insofar as the Moon is characterized as a "stepping stone" to other planets. That characterization is nothing less than common-place and has been the subject of multiple works going back hundreds if not thousands of years. Any claim of infringement in this regard borders on the absurd. Defendants' unchallenged documentation of their independent creation of the Film provides yet another reason why summary judgment must be granted in their favor. *See, e.g., Dimmie v. Carey,* 88 F.Supp.2d 142, 150–51 (S.D.N.Y.2000).

## VI.

Comins also claims tortious misappropriation of his name and/or false endorsement under Section 43(a) of the Lanham Act.

---

**4.** The Fourth Circuit has explained that "independent creation" is not an affirmative defense and, instead, "[e]vidence of independent creation simply tends to prove the reverse of that proposition, i.e., that the design was not copied." *Keeler Brass Co. v. Cont'l Brass Co.,* 862 F.2d 1063, 1066 (4th Cir.1988).

Both claims proceed on the premise that, by extending a textual "thank you" to him in the credits at the Film's conclusion, Defendants falsely implied that Comins "was involved in, and had expressed his approval for, the television program," in a manner "intended to exploit the value of [his] name and reputation in connection with the marketing of the television program." The Court finds neither of these claims to have merit.

### A.

### (Lanham Act Claim)

■ Comins appears to be asserting a claim for false endorsement under § 43(a) of the Lanham Act, which provides that: [a]ny person who, or in connection with any goods or services ... uses in commerce any word, term [or] name ... or any false designation of origin ... which is likely to cause confusion, or cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person shall be liable. 15 U.S.C. § 1125(a)(1)(A). Courts have recognized a § 43(a) injury "where the plaintiffs' voices, uniforms, likenesses, published words, or names were used in such a way as to deceive the public into believing that they endorsed, sponsored, or approved of the defendant's product." *Advanced Res. Int'l, Inc. v. Tri–Star Petroleum Co.*, 4 F.3d 327, 334 (4th Cir. 1993). In an action for false endorsement, the plaintiff must prove the likelihood of consumer confusion as to the origin, approval or endorsement of the product. *See Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1110 n. 9 (9th Cir.1992). Thus, "[s]ummary judgment is appropriate where the plaintiff 'cannot possibly show confusion as to source or sponsorship.'" *Brown v. Twentieth Century Fox Film*

*Corp.*, 799 F.Supp. 166, 173 (D.D.C.1992) (quoting *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir.1990)).

■ However ungracious it may seem for Defendants to have included Comins in its "thank you" list after deciding not to produce a film based on the Book, "[t]he Lanham Act ... should not be used as a remedy for a bruised ego." *Stratta v. George Duke Enters., Inc.*, 1997 WL 282250, *5 (S.D.N.Y.). Defendants in no way misrepresented or overrepresented Comins' contribution to the Film nor did they attempt to pass his work off as their own. *Cf. King v. Innovation Books*, 976 F.2d 824, 829 (2d Cir.1992) (enjoining distribution of movie with a possessory credit, which gave false appearance that famous author-plaintiff had involvement in and/or gave approval of the movie). Nor is this a case in which Defendants used Comins' name in any way suggesting that he endorsed the Film. *Cf. Better Business Bureau of Metro. Houston, Inc. v. Med. Directors, Inc.*, 681 F.2d 397, 403 (5th Cir.1982) (enjoining defendants from disseminating advertisements that gave false impression that plaintiff endorsed its program where there was a significant likelihood that the public would believe that plaintiff had placed its imprimatur on the program).

Comins' name was simply one among thirty-nine others to whom Defendants acknowledged an intellectual or other debt. This is a far cry from falsely or misleadingly representing Comins as the source or sponsor of the Film. Indeed, one assumes that many people would consider such recognition to be the "appropriate, as well as respectful" course of action in a situation such as this. *Debs v. Meliopoulos*, 1993 WL 566011, *7 (N.D.Ga.); *see also Storball v. Twentieth Century Fox Film Corp.*, 1993 WL 734117, *1 (C.D.Cal.) ("Mere use of a sound recording in a motion picture or

audio/visual presentation, with truthful attribution of the performance to the performers in the credits, does not constitute a representation that the performers in the sound recording approve, sponsor ·or endorse the motion picture."); *The Phila-. delphia Orchestra Ass'n v. The Walt Disney Co.,* 821 F.Supp. 341, 350–51 (E.D.Pa. 1993); *Brown,* 799 F.Supp. at 173.

The Court finds that Defendants' listing of Comins' name in the credits of the Film constituted no "false designation of origin," "false description" or "false representation," within the meaning of the Lanham Act. Their rapid passing of his name in the credits supports no finding of confusion or likelihood of confusion as to the origin, approval or endorsement of the Film. Comins' Lanham Act claim fails as a matter of law.

## B.

### (The Tort of Misappropriation)

 Insofar as Comins is alleging the tort of misappropriation under Maryland law, he fares no better. Maryland courts have adopted the Restatement (Second) of Tort's definition of invasion of privacy by misappropriation of name or likeness, according to which "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Lawrence v. A.S. Abell Co.,* 299 Md. 697, 475 A.2d 448, 451 (1984) (quoting Restatement (Second) of Torts § 652 C (1976)). As explained by the Maryland Court of Appeals, "the tort does not apply to an incidental use of a person's name or likeness," or to a use for other than a "commercial" purpose. *Lawrence,* 475 A.2d at 451.

Since the Court has found Defendants' use of Comins' name to have been merely incidental, shorn of any attempt to capitalize upon whatever commercial value it may have,[5] his claim of misappropriation comes to naught. *See Faloona v. Hustler Magazine, Inc.,* 607 F.Supp. 1341, 1360 (N.D.Tex.1985) (holding that mere publication of name or likeness does not constitute commercial misappropriation, where defendant did not "capitalize upon" or "exploit" the name or likeness in order to sell more goods).

## VII.

For these reasons, Defendants' Motion for Summary Judgment will be granted. A separate Order will be entered implementing this decision.

---

**5.** In order to prevail on the misappropriation claim, Comins must prove that his name has "commercial or other value." *Lawrence,* 475 A.2d at 453. Whether or not he has done so the Court need not decide, since the claim fails on other grounds.