Wendy C. EATON, Plaintiff,

v.

NATIONAL BROADCASTING COMPANY, et al.,
Defendants.

Civil Action No. 97–73–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 19, 1997.

Michael J. Beattie, Fairfax, VA, for Plaintiff.

Jay W. Brown, Levine Pierson Sullivan & Koch, LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this copyright infringement action, plaintiff, who developed a pilot script and treatment package for a proposed television series entitled *Genuine Gypsy*, alleges that defendants, two national television networks, which "blatantly" plagiarized her work when they aired the now-canceled situation comedy *Brotherly Love*. Defendants dispute that contention, claiming instead that the creators of *Brotherly Love* did not have "access" to plaintiff's work and that, in any event, the two works are not "substantially similar." Accordingly, the parties' cross-motions for summary judgment and partial summary judgment present two questions, namely: (1) whether it is "reasonably possible" that the creators of *Brotherly Love* and plaintiff's treatment and pilot script for *Genuine Gypsy* had crossed paths; and (2) whether the two programs are substantially similar.

### I

In 1992, plaintiff, Wendy C. Eaton ("Eaton"), developed an idea for a weekly television series, entitled *Genuine Gypsy*. In this regard, she drafted a sample script for a proposed pilot and developed a full treatment package, which included character and plot summaries and promotional strategies. Eaton's proposed show, conceived as a weekly, hour-long action, adventure, comedy, romance television series set in an auto garage in rural Virginia, focuses primarily on the relationship between a female auto mechanic and a male tow truck operator. Various of the other characters work at the garage. In November 1992, Eaton obtained a registered copyright on her show.

In March 1994, Eaton submitted the copyrighted treatment package and sample script to defendants, National Broadcasting Company, Inc. ("NBC"), and Buena Vista, a division of Walt Disney.[1] Specifically, Eaton mailed

---

1. By Order dated March 21, 1997, defendant The Walt Disney Company's motion to dismiss was granted for lack of personal jurisdiction pursuant to Rule 12(b)(2), Fed.R.Civ.P.

a copy of *Genuine Gypsy* to David Nevins, an executive at NBC, under cover of letter she drafted on the letterhead of Suzanne Miller, a self-styled "agent" with no prior experience in the television industry. Nevins' administrative assistant, Chris Conti, whose job duties included handling Nevins' mail, received Eaton's submission. Pursuant to his usual practice, Conti opened the envelope and cursorily reviewed its contents. Based on this, he determined that Eaton's submission was, as he termed it, a so-called "fringe submission," *i.e.,* one submitted by an unknown television agent.[2] Consistent with his practice in such situations, Conti threw Eaton's submission in a large pile in the cabinet behind his desk.

Following the submission of *Genuine Gypsy,* Eaton repeatedly telephoned Nevins' office to discuss the status of her submission. In response to Eaton's frequent inquiries, Conti, who also answered Nevins' telephone, told Eaton that the submission was "under consideration," which he characterized as an effort to be polite. He also answered her more general questions about the television industry and the development of a network series. Conti attests that when NBC filled its schedule, he disposed of the fringe submissions, including Eaton's, by depositing them in the trash. Conti avers that he never discussed Eaton's submission with anyone, never reproduced it, and that he never showed it to another person.

During the period of 1992–1994, actors and real-life brothers Joey, Matthew, and Andrew Lawrence and their parents engaged in discussions with Witt Thomas Productions ("Witt Thomas") and NBC concerning the possibility of creating a series for the three brothers. The parties hoped to continue their long-standing, successful relationships. Joey was then playing a very popular character on the NBC comedy *Blossom,* a Witt Thomas production. And Witt Thomas, in addition to producing *Blossom,* had produced numerous well-known NBC television series, including *Golden Girls, Empty Nest,* and *The*

*John Larroquette Show.* In the fall of 1994, after entering into a contract with the Lawrences to develop a—show, Witt Thomas began to solicit specific ideas for the new program. Jim Vallely ("Vallely") and Jonathan Schmock ("Schmock"), two television writers employed by Witt Thomas in connection with other projects, heard about this solicitation and decided to submit their own proposal. Thus, in October 1994, Vallely and Schmock proposed a series set in a guitar store in which Joey would portray the estranged half-brother of his real-life siblings Matthew and Andrew to generate dramatic tension and situations not otherwise available. The Lawrences and Witt Thomas selected their proposal, but decided that the series should be set in more of a blue-collar environment, such as an all-night convenience store or a garage. As they refined their proposal, Vallely and Schmock chose the garage for, as they put it, a certain visual appeal.

Thereafter, on January 13, 1995, Witt Thomas, Vallely, and Schmock met with NBC personnel to "pitch" their proposed series. At the meeting, NBC programmers suggested that the proposed series needed a "romantic angle" because of Joey's "matinee idol status." The group discussed the possibility of creating a female customer who would flirt with Joey's character. Vallely and Schmock agreed to accommodate NBC's request for a female character of Joey's age. Because they felt it would be unrealistic to have a female character who needed auto repairs on a weekly basis, Vallely and Schmock created the character Lou, a female mechanic who also worked at the garage.

Ultimately, this development process resulted in the drafting of a pilot script and the filming of the "rough-cut" pilot episode of *Brotherly Love,* as the weekly, half-hour situation comedy came to be named. In March 1995, Conti first saw a copy of the pilot script, and, in May 1995, he watched the "rough-cut" of the pilot episode. Although he was asked his opinion of both after they

---

2. According to defendants, submissions fall into one of three distinct categories. The first category includes "unsolicited submissions" from persons not represented by agents. As a policy, NBC returns these scripts unopened to the sender. The second category covers programming ideas "pitched" (*i.e.,* submitted orally) by established writers represented by agents. The third category consists of the "fringe submissions" received from unknown writers and agents.

were completed, Conti never offered any suggestions to the show's creators and played no role whatever in its development. The final plot focused on Joey Roman, a young man who returns to the home of his two half-brothers and their mother (his step-mother) to claim his inheritance following the death of his estranged father, an automobile mechanic and race car driver. Joe's initial plan was to collect his inheritance in cash or in the form of his late father's classic motorcycle and to ride off on his motorcycle to Florida. As matters turn out, this plan is abandoned and Joe remains and takes his place in the family garage business. The series thereafter explores his eventual integration into the family and their operation of the garage in Philadelphia.

*Brotherly Love*, produced by Witt Thomas and created by Vallely and Schmock, premiered on NBC in September 1995. It did not survive the rigorous competition for television series slots and was canceled after only one season. Thereafter, in September 1996, defendant, The WB Television Network ("The WB"), began to air the program. But like NBC, The WB also canceled the show after only one season. In all, NBC and The WB shot and aired forty episodes of *Brotherly Love;* no new episodes of the series have been ordered.

On January 17, 1997, Eaton filed this action and then immediately, but unsuccessfully, sought a preliminary injunction to enjoin The WB from airing *Brotherly Love. See Eaton v. National Broadcast Company, Inc.,* C.A. No. 97–73–A (Order, January 21, 1997). Thereafter, the parties filed numerous procedural motions.[3] Following this, pursuant to a consent Order, the parties filed dispositive

motions: NBC and WB filed their joint motion for summary judgment on July 3, 1997, while Eaton filed her response and a motion for partial summary judgment on July 17, 1997. Following oral argument, the Court, ruling from the bench, granted NBC's and The WB's motion for summary judgment, denied Eaton's motion for partial summary judgment, and dismissed the action. *Eaton v. National Broadcast Company, Inc.,* C.A. No. 97–73–A (Order, July 25, 1997).[4] This Memorandum Opinion elaborates on that ruling from the bench.

## II

Summary judgment is only proper when the record conclusively shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. This standard is met where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A "mere scintilla" of evidence, however, is not enough. To the contrary, when viewed in the light most favorable to the non-moving party, the evidence must be sufficient for a reasonable jury to find in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

While some earlier decisions suggest that summary judgment is improper in a copyright infringement case because of the

---

3. On January 27, 1997, Eaton moved for: (1) expedited discovery; (2) consolidation of preliminary injunction and trial on the merits; (3) shortening time for document production; and (4) video and audio recording in lieu of stenographic recording of deposition and to appoint individual to administer oath. The Court, *sua sponte,* continued the hearing on Eaton's motions for two weeks to give defendants adequate notice. *Eaton v. National Broadcast Company, Inc.,* C.A. No. 97–73–A (Order, January 29, 1997). Subsequently, on February 14, 1997, the Court denied Eaton's motions from the bench. *Eaton v. National Broadcast Company, Inc.,* C.A. No. 97–73–A (Order, February 14, 1997). Then, on March 21, 1997, the Court granted defendant The Walt

Disney Company's motion to dismiss for lack of personal jurisdiction and denied The WB's and NBC's joint motion to transfer to the U.S. District Court for the Central District of California. *Eaton v. National Broadcast Company, Inc.,* C.A. No. 97–73–A (Order, March 21, 1997).

4. Eaton's complaint initially named Witt Thomas, Vallely, and Schmock as co-defendants, but, on February 27, 1997, a consent Order was entered dismissing the complaint without prejudice against Witt Thomas, Vallely, and Schmock. *Eaton v. National Broadcast Company, Inc.,* C.A. No. 97–73–A (Order, February 14, 1997).

inherently subjective nature of the inquiry,[5] it is more correct to say that "such motions are nonetheless routinely granted in appropriate circumstances." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.10[A], at 12–149 (1997). Accordingly, "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros., Inc. v. American Broadcasting Cos., Inc.,* 720 F.2d 231, 240 (2d Cir.1983) (quoting *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 918 (2d Cir.1980)); *see Towler v. Sayles,* 76 F.3d 579, 584 (4th Cir.1996) (upholding the district court's judgment as a matter of law under Rule 50(a)(1), Fed.R.Civ.P., because no reasonable jury could find for plaintiff on the issues of access and substantial similarity).

## III

■ To prove copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *see also Towler,* 76 F.3d at 581. For the purposes of the parties' motions for summary judgment and partial summary judgment only, NBC and The WB concede that Eaton possesses a valid copyright in *Genuine Gypsy.* Thus, only copying is contested. But "[a]s is often the case, direct evidence of copying is lacking, making it necessary to look to circumstantial evidence." *Towler,* 76

F.3d at 581–82. The approach employed by this and other circuits involves a two-pronged standard.[6] First, the plaintiff must show that the defendant had access to the copyrighted work; second, the plaintiff must establish that the defendant's work is "substantially similar" to that of the plaintiff. *Towler,* 76 F.3d at 582; *Dawson v. Hinshaw Music, Inc.,* 905 F.2d 731, 732 (4th Cir.), *cert. denied,* 498 U.S. 981, 111 S.Ct. 511, 112 L.Ed.2d 523 (1990). Here, the parties dispute both prongs of the standard.

### A. Access

In their motion to dismiss, NBC and The WB contend that the creators of *Brotherly Love* never had access to *Genuine Gypsy.* Eaton disagrees, arguing instead: (1) that Witt Thomas, Vallely, and Schmock did not create *Brotherly Love;* (2) that Conti lied in his deposition about not showing *Genuine Gypsy* to others; (3) that Conti was an "intermediary" who transmitted her submission to Witt Thomas, Vallely, and Schmock; and (4) that some unknown person purloined her script from Conti's cabinet at NBC. Each of Eaton's claims is baseless.

■ "To prove access, [the plaintiff] must show that [the creator of the allegedly infringing work] had an opportunity to view or to copy her work." *Towler,* 76 F.3d at 582; *see also Koontz v. Jaffarian,* 617 F.Supp. 1108, 1113 (E.D.Va.1985), *aff'd,* 787 F.2d 906 (4th Cir.1986). Nevertheless, "[w]hat must be shown is more than a bare possibility of access (which would amount to no more than conjecture), but a 'reasonable possibility of access.'" *Takeall v. Pepsico, Inc.,* 809 F.Supp. 19, 21 (D.Md.1992) (citing *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 944 (8th Cir.1992); *Gaste v. Kaiser-*

---

5. *See e.g., Twentieth Century–Fox Film Corp. v. MCA. Inc.,* 715 F.2d 1327, 1329–30 n. 6 (9th Cir.1983); *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.) (citing *Arnstein v. Porter,* 154 F.2d 464, 474 (2d Cir.1946)), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

6. *See, e.g., Towler,* 76 F.3d at 582; *Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir.1996); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 606 (1st Cir.1988); *Whelan Assoc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1232 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107

S.Ct. 877, 93 L.Ed.2d 831 (1987); *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *Litchfield v. Spielberg,* 736 F.2d 1352, 1355 (9th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 824–25 (11th Cir. 1982); *Atari, Inc. v. North Am. Philips Consumer Electronics Corp.,* 672 F.2d 607, 614 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

*man,* 863 F.2d 1061, 1066 (2d Cir.1988)), *aff'd,* 14 F.3d 596 (4th Cir.1993) (table), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861(1994). Put another way, "it must be reasonably possible that the paths of the infringer and the infringed work crossed." *Towler,* 76 F.3d at 582.[7]

Eaton contends that Vallely and Schmock did not create *Brotherly Love* and that NBC personnel originated the show. Specifically, Eaton argues that Witt Thomas rejected Vallely's and Schmock's concept for *Brotherly Love* and that the ideas of Warren Littlefield, NBC's President, were central to the series' development. The record is devoid of support for Eaton's contentions. Witt Thomas rejected only Vallely's and Schmock's initial suggestion to set the show in a guitar store; the Lawrences had previously decided that the program should be set in a bluecollar environment, such as a garage or a convenience store. Vallely and Schmock chose the garage before even "pitching" the concept to NBC. And although Warren Littlefield suggested that the show have a young female character to create some romantic tension, it was Vallely and Schmock who conceived of the character Lou, the female mechanic; in fact, they rejected outright Littlefield's suggestion that the female character be a "recurring customer." In other words, the record unequivocally reflects that Witt Thomas and Vallely and Schmock, not NBC officials, created *Brotherly Love.*[8]

Eaton also asserts that Conti lied about not passing her submission to others at NBC or to the creators of *Brotherly Love.*

Although Eaton proffers no evidence to contradict Conti's testimony, she contends that his credibility is a question of fact for the jury. This bald contention is insufficient, for a copyright plaintiff cannot base her opposition to summary judgment "entirely on the hope that a fact finder will disbelieve the persons who have submitted affidavits" on issues of access. *Vantage Point, Inc. v. Parker Bros., Inc.,* 529 F.Supp. 1204, 1213 (E.D.N.Y.1981), *aff'd,* 697 F.2d 301 (2d Cir. 1982) (table). Put another way, it is axiomatic that "a party may not defeat a properly supported motion for summary judgment merely by raising generalized questions as to the credibility of the movant's affiants." *Robinson v. Cheney,* 876 F.2d 152, 162 (D.C.Cir.1989); *see also Moreau v. Local Union No. 247, Int'l Broth. of Firemen and Oilers, AFL–CIO,* 851 F.2d 516, 519 (1st Cir.1988).

In any event, none of Eaton's specific challenges to Conti's credibility create a material factual dispute. She claims that "it stretches the imagination" to believe that Conti had never met Vallely and Schmock, especially considering that they attended numerous meetings in Nevins' office. There is no factual dispute here. In his deposition, Conti averred that while he had never met or spoken with Vallely and Schmock, he had certainly seen them when they arrived for appointments. And it is immaterial whether Conti had been formally introduced to Vallely and Schmock; but, it is relevant and undisputed that Conti had no substantive conversations with them about *Genuine Gypsy* or any other topic. Eaton also contends that

---

7. Eaton contends that the doctrine of access merely requires her to prove that NBC and The WB, not the actual creators of *Brotherly Love,* had access to the copyrighted material. This contention is absurd, for proof of access is only probative of copying to the extent that the alleged copier had access to the protected work. Thus, it is access by the creators of the allegedly infringing work that must be shown.

8. In her attempt to create a genuine dispute concerning the material issue of authorship of *Brotherly Love,* Eaton also claims that Witt Thomas' copyright registration application was fraudulent. In particular, Eaton contends that Witt Thomas' application simultaneously indicated that its contribution to the series was both "anonymous" and "pseudonymous" and that this

error obviously reveals that *Brotherly Love* was based on an anonymous submission. This contention is patently frivolous. It is pellucidly clear that Witt Thomas' contradictory answers were a mere scrivener's error, for the copyright application's questions concerning anonymity and pseudonymity must be mutually exclusive. Further, it is immaterial that neither Vallely nor Schmock were listed as authors on Witt Thomas' copyright application. Under the Copyright Act, when an employee creates a work for his or her employer as a so-called "work-made-for-hire," the employer is deemed the "author" and the valid copyright holder. *See* 17 U.S.C. §§ 101 and 201(b). Accordingly, the absence of Vallely's and Schmock's names on the copyright application was duly appropriate.

Conti told her during their frequent telephone conversations that he had transmitted her submission to more senior NBC executives. The evidence in support of that claim is tenuous at best.[9] But even assuming, *arguendo*, that Conti had admitted forwarding her submission to senior NBC executives, that evidence; is insufficient to establish that the creators of *Brotherly Love* ever saw it.

Particularly instructive here is the Fourth Circuit's decision in *Towler v. Sayles*, 76 F.3d 579 (4th Cir.1996). In *Towler*, the plaintiff contended that *Passion Fish*, a movie written and directed by acclaimed filmmaker John Sayles, infringed her copyrighted screenplay for *Crossed Wires and Bobbie or Wendy were Neighbors*. There, in order to avoid judgment as a matter of law on the question of access, the plaintiff contended that the person to whom she had sent her screenplay had promised to forward it to Sayles. In affirming the district court's granting of Sayles' Rule 50 motion, a unanimous Fourth Circuit panel found that evidence insufficient to establish that Sayles had access. While crediting the plaintiff's testimony that the third party had forwarded her script to Sayles, the Fourth Circuit concluded that the plaintiff introduced no evidence by which a reasonable jury could conclude "that [the third party] actually sent [the screenplay] to Sayles" or that "Sayles [had] received [the screenplay]." *Id.* at 583.[10] Thus, much as Towler failed to establish that

the third party had actually forwarded her screenplay to Sayles, so, too, has Eaton presented no evidence that Conti actually forwarded *Genuine Gypsy* to the creators of *Brotherly Love*, let alone NBC executives.[11]

Finally, Eaton alleges that some unknown person "rummaged" through Conti's "unlocked cabinet" for her script when he went to lunch or that someone had taken it from the trash when he disposed of it or that it was surreptitiously copied while he ran an errand. These hypothetical possibilities are mere conjectures insufficient to create a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (holding that a party opposing summary judgment must "do more than show that there is some metaphysical doubt as to the material facts"). In sum, Eaton's "tortious chain of hypothetical transmittals ... is insufficient to infer access." *Towler*, 76 F.3d at 583 (citing *Meta–Film Associates*, 586 F.Supp. at 1355).

In the final analysis, Eaton failed to produce sufficient evidence from which a trier of fact reasonably could conclude that *Genuine Gypsy* ever got beyond Conti's cabinet at NBC, much less that it found its way to the creators of *Brotherly Love*. Put another way, Eaton has failed to show that there is a "reasonable possibility" that the creators of *Brotherly Love* gained access to *Genuine*

9. Eaton produced four sets of "contemporaneous notes" to support her recollection that Conti had told her submission was being "passed around the table" at NBC. But at her deposition, Eaton acknowledged that the notes were not contemporaneous, but rather that she had created them sometime after the actual conversations.

10. *See also Takeall v. Pepsico*, 809 F.Supp. 19, 22–23 (D.Md.1992) (granting summary judgment for Pepsico on the question of access because the plaintiff's evidence that he had submitted the jingle "You got the right one, Baby, uh-huh!" to several Pepsi-affiliated companies failed to establish that his "proposals were ever forwarded" to the alleged copiers), *aff'd*, 14 F.3d 596 (4th Cir. 1993) (table), *cert. denied*, 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994).

11. Accordingly, Eaton's contention that Conti was an "intermediary" who passed *Genuine Gypsy* to Witt Thomas, Vallely, and Schmock must fail for the same reason. It is well-established that "a court may infer that the alleged infringer

had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer." *Towler*, 76 F.3d at 583. To qualify as an intermediary, the third party must either: (1) supervise the alleged copier; (2) work in the same department or unit as the alleged copier; or (3) contribute creative ideas to the alleged copier. *Id.; Meta–Film Assocs., Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1355–57 (C.D.Cal. 1984). It is undisputed that Conti does not fall into any one of these three categories. First, as an administrative assistant, Conti did not "supervise" Schmock and Vallely or any other writer employed by Witt Thomas. Second, Conti did not work in the same unit or department as Vallely and Schmock; Conti worked for Nevins at NBC, while Vallely and Schmock were employed by Witt Thomas. And third, the record reflects that Conti contributed no creative ideas or material to Witt Thomas and NBC.

*Gypsy.* Her failure to raise a genuine issue of material fact as to, access justifies summary judgment for NBC and The WB in the circumstances.

## B. Substantial Similarity

In the alternative, NBC and The WB seek summary judgment on the ground that no jury could reasonably infer that the respective copyrightable elements of *Genuine Gypsy* and *Brotherly Love* are "substantially similar." In particular, NBC and The WB assert that the two works are neither objectively similar in terms of their plots, characters, setting, script, text, and themes, nor intrinsically similar in terms of their overall concept and feel. In rebuttal, Eaton offers a 17–page chart that points to numerous purported similarities between *Genuine Gypsy* and *Brotherly Love.*

 "Even if access were to be inferred, [a plaintiff] would also have to show that [the copyrighted work] is substantially similar to [the defendant's work]". *Towler,* 76 F.3d at 583. The determination of such substantial similarity involves two-steps. "First, a plaintiff must show—typically with the aid of expert testimony—that the works in question are extrinsically similar because

they contain substantially similar ideas that are subject to copyright protection." *Id.* The "extrinsic" evaluation should assess the similarity between the two works' objective elements, such as plot, theme, characters, setting, pace, mood, and dialogue. *See Dawson,* 905 F.2d at 733–37; *Litchfield,* 736 F.2d at 1356–57. And "[s]econd, a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed." *Towler,* 76 F.3d at 583–84. The "intrinsic" evaluation should appraise whether the "total concept and feel " of the disputed work resembles that of the plaintiff's, as measured by the perception of an ordinary observer, namely, that of a television viewing person. *See Id.; Dawson,* 905 F.2d at 733–37.[12]

### 1. Objective Similarity

A comparison of *Genuine Gypsy* and *Brotherly Love* instantly discloses significant substantial differences between the two shows, so much so that no reasonable jury, properly instructed, could find that the objective, copyrightable elements of Eaton's unproduced pilot script are substantially similar to defendants' televised series.[13] While there

**12.** Eaton urges the adoption of two new rules of copyright law. First, Eaton, assuming that she has prevailed on the question of access, claims that the "inverse ratio rule" permits her to produce limited evidence of substantial similarity between the two works. In essence, this rule would require a court to decrease the quantum of similarity required whenever a plaintiff demonstrates access on the part of defendant. Eaton cites no particular case for this proposition, but she describes Professor Nimmer as a advocate of the theory. This contention is meritless. The current edition of Nimmer notes that this socalled "inverse ratio rule" has been rejected. 4 *Nimmer on Copyright* § 13.03[D] at 13–83 & n. 196 (citing *Arc Music Corp. v. Lee,* 296 F.2d 186, 187–88 (2d Cir.1961)). In fact, two Courts of Appeal recently criticized and rejected this theory. *See Green v. Lindsey,* 885 F.Supp. 469, 479–80 (S.D.N.Y.1992), *aff'd,* 9 F.3d 1537 (2d Cir. 1993) (table), *cert. denied,* 510 U.S. 1202, 114 S.Ct. 1318, 127 L.Ed.2d 667 (1994); *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 902 (9th Cir.1987). Accordingly, this Court declines Eaton's invitation "to proceed under a reduced quantitative similarity threshold."

Second, Eaton argues that a burden-shifting standard requires her merely to produce evidence of "sufficient similarity" and that defen-

dants must then show that *Brotherly Love* was created independently of *Genuine Gypsy.* This test is not the law of this or any other circuit and, as a result, it is neither persuasive nor controlling here.

**13.** The parties provided analyses of the objective elements of the two shows. On the one hand, NBC and The WB provided an extensive comparison of the two works in question conducted by Arnold Margolin, Co–Vice Chairman of the Writers Guild TV Credits Committee and a veteran television writer of roughly thirty years. On the other hand, Eaton supplemented her pleadings with a detailed 17–page chart that compares random fragments of dialogue, scenes, and characteristics. The Fourth Circuit and other courts have squarely rejected reliance on such lists: "We believe that a list comparing 'random similarities scattered throughout the works' is 'inherently subjective and unreliable.' " *Towler,* 76 F.3d at 584 (quoting *Litchfield,* 736 F.2d at 1356); *see also Williams,* 84 F.3d at 590 (holding that lists of random similarities are not probative of substantial similarity "because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another"). Instead of relying on such scattershot lists, the Fourth

are, indeed, some similarities between the two works, they represent only superficial, haphazard, and at most skeletal resemblances. First, there is nothing in the respective plots of the two works that is substantially similar, other than some generic, commonplace themes. A summary of the pilot scripts for *Genuine Gypsy* and *Brotherly Love* is particularly instructive here.

*Genuine Gypsy* follows the adventures of Zee, a female mechanic. In the pilot, Zee awakens late for work and, while driving to the service station, she discovers that her brakes have been sabotaged, causing her very nearly to miss colliding with a cow. Later that morning, a sexist customer sets Zee's hair on fire. As a consequence, Zee visits her hairdresser for an emergency hair appointment. In the meantime, Jim, a young stranger from a nearby town arrives with a tow truck and obtains a job towing and repossessing autos for the station. That night, while attempting to repossess an auto, Jim is savagely beaten by two men and requires hospitalization. Later that very evening, Zee is stalked and attacked by an unknown assailant, but she manages to elude him. While Jim continues to recuperate in the hospital, Zee repairs his tow truck, which was damaged in the vicious assault. Then, a murderer escapes from prison and eventually kidnaps Zee. Ultimately, Jim rescues Zee, but not before she is seriously wounded. The show ends with Jim, Zee, and the other characters taking a day off to go fishing.

*Brotherly Love* follows Joe Roman, a young man raised by his mother after she divorced his father, who was a race car driver and owner of an auto customizing and repair garage. In the pilot, Joe arrives at the garage shortly after his estranged father's death to claim his inheritance, part of the garage, from his stepmother because he needs the money to travel to Florida to race motorcycles. A conversation between Joe's step-mother, Claire, and her two employees, Lou, a female artist working as a mechanic, and Lloyd, an overweight, slightly peculiar

mechanic, establishes that the garage is in serious financial trouble. In the meantime, Joe's half-brother, Matt, who had promised the seventh prettiest girl at high school that he would perform in a variety show, is trying to escape from his commitment. Joe manages to persuade Matt to perform at the show and he also begins to draw out six-year-old Andy, his other half-brother, who had withdrawn into a world of imaginary characters following his father's passing. In a stroke of genius, he solves both problems simultaneously. Thus, he devises a "ventriloquist" act in which Matt pretends to manipulate Andy, whose legs and arms are attached to marionette-like sticks, while Andy, dressed as a mini-Elvis, lip-synchs to the famous Elvis song "Blue Suede Shoes." Discovering a fondness for his halfbrothers and a desire to help Claire save the family business, Joe decides to remain there with his family indefinitely.

As these synopses demonstrate, other than a few generalized resemblances, the respective plots and the sequences of events of the two pilot shows are wholly unrelated and entirely dissimilar. And, of course, general ideas, themes, or plots are not eligible for copyright protection. *See, e.g., Jones v. CBS, Inc.,* 733 F.Supp. 748, 753 (S.D.N.Y. 1990) (holding that "all fictional plots, when abstracted to sufficient level of generalization, can be described as similar to other plots"); *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.) ("It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself."), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

But, Eaton claims that the characters portrayed in *Brotherly Love* are substantially similar to those in *Genuine Gypsy.* Yet, even a cursory review of the shows' characters reveals overwhelming differences, for the only likenesses here involve gross generalizations. It is well-established that

Circuit counsels that the reviewing court itself should closely analyze the two works at issue for extrinsic similarities. *Towler,* 76 F.3d at 584; *see also Williams,* 84 F.3d at 583 (holding that on defendants' motion for summary judgment,

"a determination of substantial similarity requires a 'detailed examination of the works themselves'"). Accordingly, this Court has undertaken an independent and searching review of the two works in question here.

"[c]opyright law provides very limited protection to characters presented in a creative work. Basic character types are not copyrightable." *Jones,* 733 F.Supp. at 753 (finding it insufficient to establish infringement where the plaintiff's work contained a "conjure lady" and the defendant's work contained "Sister Sadie, a voodoo practitioner"). In other words, "only a uniquely developed character with some degree of novelty is copyrightable." *Id.; see also Smith v. Weinstein,* 578 F.Supp. 1297, 1303 (S.D.N.Y.1984) ("No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines."), *aff'd,* 738 F.2d 419 (2d Cir.1984) (table). This is not the case here.

*Genuine Gypsy* contains ten "regular" or continuing characters.[14] Of the ten, five (a 17-year-old firefighter, a fire chief, the, hairdresser, and two law enforcement officers) bear no resemblance whatever to any of the continuing characters in *Brotherly Love.* The five remaining characters (Zee, Henry, Jim, Roy, and Bill) each share some basic characteristics with one or more characters in *Brotherly Love.* But none of these basic resemblances are enough.

- While both Zee and Lou are female mechanics who are good at their jobs, Zee is the main character in *Genuine Gypsy* and Lou is a secondary character in *Brotherly Love* not central to the primary story line, which chiefly involves the relationship between Joe and his two half-brothers, Andy and Matt. Aside from their similar jobs and gender, Lou and Zee do not share any other defining characteristics. For example, Lou is an aspiring artist.[15]

- The only characteristic that Henry, the owner of the service station in *Genuine Gypsy,* and Claire, the co-owner of the garage (with her step-son Joe) in *Brotherly Love,* share is that both are supposedly "fair." Otherwise, everything else about Henry and Claire is vastly different—their age, sex, and family situations.

- And while both *Genuine Gypsy* and *Brotherly Love* have lead male characters in their early twenties who work with autos, Jim and Joe share no other primary similarities.

- Moreover, *Genuine Gypsy* has Roy, a six-year-old African–American child who lives near the station and spends a lot of time there, while *Brotherly Love* has Andy, the Caucasian, six-year-old half-brother of Joe. Aside from being cute and precocious, like many other six-year-old television characters, they are not similar in any other way.[16]

- Finally, even though both works contain a secondary male character who is overweight, works at the respective garages, and is the "butt" of jokes, Bill *Genuine Gypsy* and Lloyd (*Brotherly Love*) share little else in common.[17]

14. *Genuine Gypsy* also contains fifteen "cameo" characters who bear no substantial likeness to any characters in *Brotherly Love.*

15. The fact that both Lou and Zee are engaged in a field of employment traditionally dominated by persons of the other gender is not sufficiently innovative and, consequently, not eligible for copyright protection. In the past, such trailblazing characters have included a female cab driver (Marilu Henner as Elaine Nardo on the ABC situation comedy *Taxi*), a male housekeeper (Tony Danza as Tony Micelli on the ABC comedy *Who's the Boss?*), a female demolition derby driver (Roz Kelly as Pinky Tuscadero on the ABC show *Happy Days*), a female doctor in the old wild West (Jane Seymour as Dr. Michaela Quinn on the CBS series *Dr. Quinn, Medicine Woman*), and a twenty-fifth century female starship captain (Kate Mulgrew as Captain Kathryn Janeway on the UPN show *Star Trek: Voyager*).

16. In fact, any television fan can name a handful of precocious child characters featured in televised series over the years. In particular, two especially cute and bright African–American characters immediately spring to mind: Arnold Jackson, portrayed by Gary Coleman, in the NBC sitcom *Diff'rent Strokes,* and Webster Long, portrayed by Emmanuel Lewis, in the ABC situation comedy *Webster.* Thus, the idea of an amusing child character is not original to Eaton.

17. The concept or idea of a humorous, corpulent character is also not especially distinctive. In recent years, numerous shows have featured such characters. Prominent among them have been Norm, as portrayed by George Wendt, in the NBC sitcom *Cheers,* Dan, as portrayed by John Goodman, in the ABC comedy *Roseanne,* Newman, as portrayed by Wayne Knight, in the NBC series *Seinfeld;* and Rerun, as portrayed by

Thus, even though the two works share certain superficial similarities, such as two female mechanics, two young boys, and two garage owners, there are no meaningful or substantial similarities between them. And, in any event, the basic human traits that certain characters share, including age, sex, and occupation, "are too general or too common to deserve copyright protection." *Sinicola v. Warner Bros., Inc.*, 948 F.Supp. 1176, 1187 (E.D.N.Y.1996).

■ Eaton also emphasizes that the two works share many details and minutiae because they both take place in automotive garages. She points, for example, to the recurrence of wrenches, tires, and automobiles. Nevertheless, as a general rule, copyright law does "not protect 'scenes a faire,' *i.e.*, sequences of events that necessarily result from the choice of a setting or situation." *Sinicola*, 948 F.Supp. at 1184. Put another way, scenes a faire are "incidents, characters, or settings which, as a practical matter, are indispensable or standard in the treatment of a given topic." *Walker v. Time Life Films, Inc.*, 615 F.Supp. 430, 436 (S.D.N.Y.1985), *aff'd*, 784 F.2d 44 (2d Cir.) (holding that scenes a faire "such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about . . . policemen in the South Bronx"), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). In the present case, given that both *Genuine Gypsy* and *Brotherly Love* are set in automotive repair garages and have female mechanics, it is predictable that both would have a number of details in common.[18]

Moreover, the mood and pace of both works are substantially different, not similar. In her treatment package, Eaton described *Genuine Gypsy* as a show "[f]illed with adventure, suspense, mystery, romance, and situations that will make you laugh in every episode." Indeed, Eaton's program features several scenes of brutal violence, including a burning, a severe beating, gunshot wounds, and a kidnaping. And Eaton intended *Genuine Gypsy* to be shot on location, largely outdoors, using film rather than videotape, and relying on music to help establish the dramatic mood. In contrast, *Brotherly Love* aired as a situation comedy, with no pretensions to adventure, suspense, or mystery. The only violence in *Brotherly Love* was the water-balloon fight in the pilot and another episode where some college students hang Matt on the front door knocker because he refused to give them candy on Halloween. Further, *Brotherly Love* was filmed in Los Angeles on a sound stage using videotape.

In the final analysis, there is a paucity of objective or extrinsic similarities between *Genuine Gypsy* and *Brotherly Love* which are protectable under the law. To the extent that Eaton demonstrates similarity, it involves only "stock" characters, scenes a faire, or common themes. In such circumstances, summary judgment is proper.

**2. Subjective Similarity**

NBC and The WB also contend that *Genuine Gypsy* and *Brotherly Love* are intrinsically dissimilar. In the present case, after reviewing the undisputed works, it is pellucidly clear that no reasonable juror could conclude

---

Fred Berry, in the syndicated show *What's Happening!!*.

**18.** The district court's granting of summary judgment in *Sinicola v. Warner Bros., Inc.*, 948 F.Supp. 1176 (E.D.N.Y.1996) is especially instructive. There, the two works in question (a novel and a movie) both concerned the New York City mob and their protagonists' search for revenge. In rejecting the plaintiff's alleged list of "substantial similarities," the district court explained that:

Copyright . . . does not afford exclusive protection to the various themes, characters and setting shared to some extent by the works upon which plaintiff relies, including sympathetic

mob bosses, respected avengers, corrupt cobs, police shakedowns, renegade mobsters, mob hangouts in neighborhood businesses, tip-offs, pointed-object-to-the-head homicides, races to capture killers, shots fired at dead bodies, generic tattoos, drug trafficking, common Italian or Irish names, mob jargon, working class neighborhoods, and claps of thunder. To the extent these elements are shared by both works, none of these elements originated with plaintiff. . . . Similarities in the works as to these themes, characters, and settings are too general or trivial or are stereotyped expression amounting to unprotectable scenes a faire.

Like *Sinicola*, many of the purported similarities about which Eaton complains are, in fact, noncopyrightable, non-actionable scenes a faire.

that *Brotherly Love* was copied from *Genuine Gypsy*. While there are some superficial similarities between the two works, no ordinary member of the television viewing audience would find the programs substantially similar; in fact, precisely the opposite is the case, for the total concept and feel of the two programs is palpably different. This conclusion becomes inescapable when this case is contrasted with the many other cases—with far more significant, serious similarities—which were insufficient to create material issues of disputed fact. *See, e.g., Beal,* 20 F.3d at 456–58 (finding insufficient similarity where both works involved wealthy foreign princes coming to America in search of wives, parental interference, initial choice of inappropriate mate, and a happy return to the native homeland); *Litchfield,* 736 F.2d at 1354–55 (finding insufficient similarity where both works concerned an alien with extraordinary powers who befriends a child, was welcomed into the family, adopted human habits, thwarted evil-doers, and then returned to his native world); *Warner Bros., Inc.,* 720 F.2d at 243 (holding insufficient similarity when both works focused on a white male superhero who wore a tight costume and cape, flew with his arms extended, led double lives, and rescued innocent people from evil-doers). Thus, Eaton has also failed to satisfy the intrinsic similarity element of her infringement claim.

## IV

Based on the foregoing analysis, the Court granted NBC's and The WB's joint motion for summary judgment, denied Eaton's motion for partial summary judgment, and dismissed this action in its entirety.

An appropriate Order has issued.