Christopher ROBINSON, Plaintiff,

v.

NEW LINE CINEMA CORPORATION, et al., Defendants.

No. CIV. AMD 97–3859.

United States District Court, D. Maryland.

July 6, 1999.

Francis Joseph Gorman, Gorman & Williams, Baltimore, MD, for plaintiff.

Dino S. Sangiamo, Nell B. Strachan, Venable, Baetjer & Howard, Baltimore, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

In this copyright infringement action, Christopher Robinson sued New Line Cinema Corporation ("New Line") and others involved in the production of the film "Set it Off," alleging that defendants' movie in-

fringed the copyright in Robinson's screenplay, "Sister Sarah." On April 13, 1999, I granted New Line's motion for summary judgment on all counts. *Robinson v. New Line Cinema Corp.*, 42 F.Supp.2d 578 (D.Md.1999). In so doing, I concluded that Robinson failed to demonstrate a reasonable possibility of access to his screenplay by the creators of "Set it Off," and further that, as a matter of law, the works were not substantially similar.

Pending before the court is Robinson's motion to alter or amend the adverse judgment and New Line's motion for an award of partial attorney's fees and costs. I have thoroughly considered the parties' respective submissions and no hearing is necessary. *See* Local Rule 105.6. For the reasons set forth below, I will deny both motions.

## I. FACTS

A full statement of the factual and procedural history may be found in my earlier opinion and I set forth here only so much of the facts as are necessary to the resolution of the pending motions. In 1992, Robinson wrote a screenplay, "Sister Sarah," about six young women in Baltimore who commit various robberies.[1] Near the beginning of the screenplay, Sarah, the main character, is raped by her father. Thereafter, Paris, Sarah's older sister, fatally shoots their father and is arrested and charged with homicide. The women, who are close friends, then rob various local businesses in order to raise the money required for Paris's bailbond. One of them dies during a botched robbery of a local pool hall. The others complete two additional robberies and as a result, finally raise the money for Paris's bailbond. The screenplay ends with Paris "jumping bail" and Sarah marrying a man who had been employed at one of the victim businesses robbed by the gang.

---

1. Robinson registered "Sister Sarah" with the Writer's Guild of America on August 12, 1993

and obtained a copyright for the screenplay on November 5, 1996.

In August 1993, Robinson contacted New Line and spoke with Amy Labowitz, then the Manager of the Acquisitions Department, about submitting his script. Labowitz informed Robinson that unsolicited works, like Robinson's, must be submitted to New Line through an agent or an attorney. Accordingly, Robinson's attorney, Jay Grubb, Esq., submitted the "Sister Sarah" screenplay to Labowitz. After assessing the script, New Line rejected Robinson's screenplay and returned the script to him in September 1993.

New Line released "Set it Off" in 1996. The movie centers on four African American women living in Los Angeles, longtime close friends, who commit bank robberies in order to fulfill their "desire to move away," to fight back against "the unfairness of the system," and to combat alienation and poverty. *See* Def.s' Memo Summ. J. at 24. Each character's motivation for participating in the robberies is fully developed during the movie's opening scenes. The first few bank robberies are successful. After their loot is stolen, however, one of the women shoots and kills the alleged thief. Consequently, the women recognize that they must leave town. Thus, they decide to rob the largest bank in Los Angeles to obtain money for their "getaway." The robbery turns violent and results in a lengthy car chase with the police. Ultimately, the movie ends with the tragically-portrayed deaths of three of the four female main characters. The final character escapes on a bus to Mexico.

Takashi Bufford, a screenwriter who had previously written screenplays for New Line, wrote the initial screenplay for "Set it Off." Bufford's screenplay was rejected by New Line, however, in late 1993. After he secured the interest of co-defendant Peak Productions, Inc. in producing the screenplay in 1994, however, Bufford persuaded New Line to release the film. Executives at New Line and Peak Productions worked to improve the script, and eventually replaced Bufford with another

screenwriter, Kate Lanier, to fashion a final script.

## II. DISCUSSION

### A. Robinson's Motion to Alter or Amend

Robinson has moved to alter or amend the adverse judgment pursuant to Fed. R.Civ.P. 59(e). He argues that the court erred as to its ruling on the issues of "access" and "substantial similarity." I address each of these contentions in turn.

#### 1. Access

As an element of his copyright infringement claims, Robinson must demonstrate that the defendants "had an opportunity to view or to copy [his] work." *Towler v. Sayles,* 76 F.3d 579, 582 (4th Cir.1996). Robinson must establish a reasonable possibility of access between the plaintiff's work and the defendant copier, here Bufford. Access can be inferred from evidence that a third party—one who supervises or works in the same department as the alleged infringer—was an intermediary in the chain of communication between the plaintiff and one of the defendant-copiers. *See e.g., Zervitz v. Hollywood Pictures, Inc.,* 989 F.Supp. 727, 729 (D.Md.1995). In addition, in a corporate context, access can be inferred when the circumstances are such that "the fact that one employee of the corporation has possession of plaintiff's work should warrant a finding that another employee (who composed defendant's work) had access to plaintiff's work, where by reason of the physical propinquity between the employees the latter has the opportunity to view the work in the possession of the former." *Moore v. Columbia Pictures, Ind.,* 972 F.2d 939, 942 (8th Cir.1992)(citing 4 *Nimmer on Copyright,* § 13.02[A] ).

I concluded that Robinson had failed to generate a triable issue as to access because he failed to demonstrate a reasonable possibility of access to his script by Bufford. Robinson's sole evidence of ac-

cess was the undisputed fact that he submitted his screenplay to the Manager of the Acquisitions Department, Labowitz. From that naked fact, Robinson insisted that a reasonable fact finder could reach the following conclusions by a preponderance of the evidence: that Labowitz transmitted the "Sister Sarah" script to Helena Echegoyen, a Productions Department executive, perhaps during one of a series of weekly company meetings, and that Echegoyen then transmitted the script to Bufford, a close friend of Echegoyen who was contemporaneously working on a script for Echegoyen and New Line. This hypothetical chain of inferences was urged in the face of (1) Labowitz's testimony denying that she ever transmitted Robinson's script (or any script) to Echegoyen or ever worked with her on any project; (2) testimony that the weekly company meetings were held to discuss what projects were being currently produced in each department and that Labowitz and Echegoyen rarely spoke at such meetings; and (3) Bufford's testimony that he began working on the idea for "Set it Off" in 1992.

In sum, Robinson produced no affirmative evidence to support the chain of events he hypothesized. Accordingly, I concluded that Robinson did not generate a triable issue as to access through a third party intermediary because (1) Labowitz, who received the script, did not work with Bufford, did not work in the Productions Department, and did not contribute any creative ideas to the writers; and (2) there was no evidence beyond mere speculation that Echegoyen ever received a copy of Robinson's script. Moreover, because "proof of access is only probative of copying to the extent that the alleged copier had access to the protected work," I rejected Robinson's contention that New Line, in general, could serve as the intermediary. *Eaton v. National Broadcasting Co.*, 972 F.Supp. 1019, 1023, n. 7 (E.D.Va. 1997), *aff'd without op.*, 145 F.3d 1324 (4th

Cir.1998). Additionally, Robinson failed to satisfy the "corporate receipt" doctrine, as the absence of a physical connection between the two departments, coupled with the separate roles of the departments, the uncontradicted denials by Labowitz and Echegoyen, and the complete absence of affirmative evidence by Robinson failed to justify an inference of access through general corporate receipt.

Robinson now reiterates that New Line's receipt of his screenplay, alone, generates a triable issue as to a reasonable possibility of access. Specifically, he asserts that the "finding"[2] that "the Acquisitions Department at New Line was 'a completely separate department from the Productions Department' at New Line" is erroneous, pointing to selected excerpts from Labowitz's deposition testimony in which she conceded that as the Manager of the Acquisitions Department, she sometimes looked for scripts for New Line.

Robinson's argument is not persuasive. My discussion about the separate nature of the Productions and Acquisitions departments merely expounded upon the principles behind the corporate receipt doctrine. The statement that the two departments were separate referred to the separate physical nature of the departments, as each was on a separate floor. This point is made in a footnote that immediately followed the statement regarding separate departments. Corporate receipt permits an *inference*, but only an inference, when the factual circumstances would reasonably support such an inference. A statement regarding the absence of a physical proximity between the recipient of the script and the ultimate producer of the allegedly infringing movie (albeit, here, not even the office of the creator of the script) highlights the absence of circumstances that would permit a rational inference of access to be drawn. This line of reasoning does not contradict Labowitz's testimony that she sometimes looked for scripts for

**2.** Robinson characterizes the conclusion as a "finding." *Of course, on a motion for sum-* mary judgment, the court does not make "findings."

New Line. Thus, Robinson's argument is unavailing.

Second, Robinson contends that I "implied [ ] that New Line had [established procedures] to insulate decision making and creative personnel from unsolicited submissions to New Line," and improperly relied on this "finding," contrary to a view of the facts set forth in the light most favorable to Robinson. Robinson argues that because New Line did not prove that such procedures were established (and arguably concedes none existed), the issue of access was for the jury. I disagree.

Robinson's predicate for this argument is a straw man. In my discussion of the corporate receipt doctrine, I stated that "the mere fact that a work is mailed to a corporation which happens to be a defendant is not sufficient by itself to generate a dispute of fact." Then, I cited a few examples of cases in which the corporate receipt doctrine failed to support plaintiff's claims. Next, I cited *4 Nimmer on Copyright* § 13.02[A], as an additional example of a circumstance in which bare corporate receipt will not give rise to an inference of access. Thus, I made no finding or assumption that New Line had established such procedures as described by *Nimmer*, nor did I rely on such an implication in concluding that Robinson failed to demonstrate access.

Accordingly, Robinson's motion to alter or amend as to the issue of "access" will be denied. I remain convinced that "the record demonstrates no reasonable possibility of access on the part of defendants." Robinson's attempt to pave the way for an inference of access because of his submission to Labowitz, who had no connection to "Set it Off," is unavailing. Furthermore, the complete absence of evidence linking Labowitz to Echegoyen, and more importantly to Bufford, makes Robinson's failure to demonstrate access manifest.

## 2. Substantial Similarity

■ Robinson also contends that I erred in my "substantial similarity" analy-sis. To avoid summary judgment on this issue, Robinson must demonstrate a triable issue that "Sister Sarah" is substantially similar to "Set it Off." *See Towler*, 76 F.3d at 583. Substantial similarity involves a two prong analysis: the first prong requires a comparison of the extrinsic elements of the two works to determine whether they contain substantially similar ideas, whereas the second element requires an intrinsic similarity analysis to evaluate whether the "total concept and feel" of the two works is the same. *See Towler*, 76 F.3d at 583; *Dawson*, 905 F.2d at 736.

Robinson contends that I erred in the application of the extrinsic prong. In sum, I concluded that the plots were similar only to the extent that both works involved African American women committing crimes. The robberies committed by the characters were different, the opening scenes were different, the purported "sibling event" in each work was different and the romantic interest of the main character in each work was different. Thus, at every critical juncture, the plot of "Sister Sarah" was different from "Set it Off." I also compared minor events and occurrences common to both works and concluded that these alleged similarities, i.e., the existence of security cameras, robbery countdowns, and violence, were scenes a faire that are not protected by copyright. *See e.g., Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996)("[S]cenes a faire, sequences of events that 'necessarily result from the choice of a setting or situation,' do not enjoy copyright protection.")(*quoting Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.1986)).

In addition, I concluded that the themes of both works are different. "Set it Off" focused on each character's "need for money, the desire to move away, the unfairness of the system, and the larger effect the system has on the individual," whereas "Sister Sarah" could hardly be interpreted as conveying such ideas. In fact, "Sister

Sarah" does not involve hopelessness or the commission of crimes to escape poverty. Furthermore, the characters of the respective works lack similarities, notwithstanding Robinson's argument that individual characters in each were "tough," "beautiful," or "shy." Likewise, the works' settings in Los Angeles and Baltimore, respectively, were not substantially similar.

■ Robinson argues that the "Court failed to address Plaintiff's . . . argument that the *combination* of the elements in 'Sister Sarah' is original and unique and therefore entitled to copyright protection." Pl.'s Reply Mem. at 3. This contention is unpersuasive. New Line did not dispute Robinson's copyright in "Sister Sarah." Additionally, that a combination of unoriginal elements can be combined in an original fashion to make a work eligible for copyright protection is not in dispute. *See Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109–10 (9th Cir.1970). Because the copyrightability of "Sister Sarah" was not at issue, I need not have paused to consider this issue.

It appears, however, that Robinson makes this argument because he takes issue with my application of *Towler* in a way that requires extrinsic elements to be copyrightable themselves before they can be considered substantially similar. *See* Pl.'s Reply Memo at 3 ("Even if none of these plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of the similar events gives rise to a triable question of substantially similarity of protected expression." (*quoting Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir.1990)(summary judgment in a case involving a literary work not appropriate if extrinsic prong of test presents a triable issue of substantial similarity))).

■ I understand the rule of *Shaw*. The quoted passage, however, is not relevant to Robinson's claim. "Sister Sarah" and "Set it Off" *do not* contain "all . . . similar events," nor does my opinion suggest this.

Rather, I reasoned unambiguously that reasonable jurors could not find that the two works were substantially similar in the major extrinsic elements: plot, theme, character, dialogue, setting, mood, and pace. Furthermore, I reasoned that in the very few ways that the works were similar, these existed not in elements that would give rise to a triable of issue of fact, based on the coincidence that both works contained them, but rather from scenes a faire, or stock scenes inherent in making a work about violence and crime. Thus, Robinson's appeal to *Shaw* is unpersuasive.

As a corollary to this argument, Robinson argues that I misapplied *Towler*, that is, he contends that there is no requirement that similar elements be entitled to copyright protection. *Towler* states that "a plaintiff must show that . . . the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection." *Towler*, 76 F.3d at 583; *see also Williams*, 84 F.3d at 587 (noting that summary judgment is appropriately granted if "the similarity concerns only noncopyrightable elements of plaintiff's work"); *Eaton*, 972 F.Supp. at 1023 ("a court may determine non-infringement as a matter of law on a *motion for summary judgment*, [ ] because the similarity between the two works concerns only 'noncopyrightable elements of the plaintiff's work.' ") (citation omitted).

Robinson posits that there is no requirement that substantially similar ideas be subject to copyright protection. *See* Pl.'s Mot. at 3–4. *See also* Pl.'s Opp. to Summ. J. at 18–19 (asserting that because ideas are not subject to copyright protection in the first place, nothing could ever be substantially similar if *Towler* were applied literally). Thus, Robinson asserts that I "never objectively applied the elements of the extrinsic test as envisioned by the line of cases that led up to the *Towler* decision—*Sid & Marty Krofft Tel. Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th

Cir.1977); *Shaw v. Lindheim,* 919 F.2d 1353 (9th Cir.1990); *Litchfield v. Spielberg,* 736 F.2d 1352 (9th Cir.1984); *Dawson v. Hinshaw Music, Inc.,* 905 F.2d 731 (4th Cir.1990)."

*Towler* appears to be an outgrowth of the hallmark copyright infringement standard that to succeed on a copyright infringement case, a plaintiff must demonstrate that "the defendant copied *protected elements* of that work." *Feist Publications, Inc. v. Rural Tel. Serv.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)(emphasis added). The substantially similar test was designed to aid a fact finder in assessing whether the plaintiff has met the elements of the copyright infringement test. Thus, *Towler* states that "a plaintiff must show... that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection." *Towler,* 76 F.3d at 583. "Ideas" in this formulation must refer to the extrinsic elements that are compared, such as plot, theme, dialogue, mood, etc.

I am not persuaded that I misapplied *Towler.* A comparison of the cases cited by Robinson demonstrates that they do not contradict the *Towler* standard. For example, in *Dawson,* the Fourth Circuit spent little time discussing the extrinsic similarity standard. The court's only reference to the standard occurred when it stated that "the plaintiff must establish substantial similarity of ... the ideas of the two works...." *Dawson,* 905 F.2d at 732. The court devoted the remainder of its opinion to parsing out the standard for evaluating intrinsic similarity. *See id.* at 733–738.

In *Litchfield,* the court stated that "similarity of ideas may be shown by an extrinsic test which focuses on alleged similarities in objective details." *Litchfield,* 736 F.2d at 1356. In that case, however, "any similarities in plot exist[ed] only at the general level for which Plaintiff cannot claim copyright protection." *Id.* at 1357. This standard does not conflict with *Towl-*

er. Similarly, even in *Shaw,* the Ninth Circuit recognized that the extrinsic test "focuse[d] not on basic plot ideas, which are not protected by copyright ..." and discounted any similarities in mood, setting, and pace between the two works, as they were "common to any action adventure series." *Shaw,* 919 F.2d at 1363.

Thus, the cases cited by Robinson do not support his blanket contention that *Towler* represents an incorrect standard or that *Towler* was incorrectly applied here. Rather, the cases demonstrate that courts make distinctions between the types of elements that can and cannot be compared in the extrinsic analysis, consistent with the parameters of copyright protection.

**B. New Line's Motion for Partial Attorney's Fees**

New Line has moved for an award of partial attorney's fees, in the amount of $49,914.72. The motion focuses on the expenditures related to the taking of 14 depositions noticed by Robinson.

 The Copyright Act provides, in pertinent part, that in any copyright infringement action "the court may ... award a reasonably attorney's fee to the prevailing party...." 17 U.S.C. § 505. An award of attorney's fees lies solely within "the sound discretion of the trial court." *Rosciszewski v. Arete Assoc.,* 1 F.3d 225, 233 (4th Cir.1993). In deciding whether to award fees to a prevailing party, the Fourth Circuit has "instructed district courts to consider: (1) the motivation of the parties; (2) the objective reasonableness of the legal and factual positions advanced; (3) the need in particular circumstances to advance considerations of compensation and deterrence; and (4) any other relevant factor presented." *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.,* 74 F.3d 488, 497 (4th Cir.1996).

New Line argues that it should be awarded attorney's fees for several reasons. First, although it concedes that Robinson has not acted in bad faith in

pursuing his copyright infringement action, it correctly notes that "the presence or absence of [bad faith] motivation is not necessarily dispositive" to an award of attorney fees. *Rosciszewski,* 1 F.3d at 234. Second, New Line contends that Robinson's claims were extremely weak. Third, New Line argues that it was unreasonable for Robinson to sue the number of defendants that he did and for Robinson to insist on taking 14 depositions. Finally, New Line asserts that Robinson's settlement offer was unreasonable.

Robinson emphasizes that he did not act in bad faith in instituting and pursuing this litigation, noting that his counsel actually communicated with defendants in 1996, weeks before the release of their movie. Moreover, Robinson defends his decision to sue each defendant because each individual or entity sued was advertised as participating in the production and release of "Set it Off." Similarly, Robinson asserts that each of the 14 depositions was necessary so that he could discover the role each individual played in producing "Set it Off," determine his or her financial interest in the production, decipher the "access trail," and for other legitimate, professionally sound strategic and tactical reasons. Finally, Robinson denies that his opening settlement offer, to which defendants made no substantive response, was unreasonable.

■■■■ After carefully balancing the factors set forth in *Superior Form Builders,* I will deny New Line's motion for attorney's fees. First, it is clear (and undisputed) that Robinson did not pursue this claim in bad faith. Although "the presence or absence of [bad faith] motivation is not necessarily dispositive," it remains one factor that the court may consider, and I accord it significant weight under the circumstances in the case at bar.

The second factor I consider is the "objective reasonableness of the legal and factual positions advanced" by the parties. Although I granted summary judgment in favor of defendants, this does not equate to a conclusion that Robinson's claims are objectively unreasonable. Otherwise, the granting of attorney's fees would be as a matter of course in every copyright infringement case, rather than a matter of discretion exercised by the court. *See e.g., Langman Fabrics v. Samsung America, Inc.,* 997 F.Supp. 479, 481 (S.D.N.Y.1998)(denying fees to the prevailing defendant because plaintiff's arguments, which were rejected by the court, were not objectively unreasonable); *FASA Corp. v. Playmates Toys, Inc.,* 1 F.Supp.2d 859, 864 (N.D.Ill.1998)("Not all unsuccessfully litigated claims are objectively unreasonable."); *Garnier v. Andin Int'l, Inc.,* 884 F.Supp. 58, 62 (D.R.I.1995)(holding that although plaintiff's suit was "premised [ ] on an erroneous view of the law," it was not unreasonable).

Robinson wrote a screenplay that involved African American women who committed crimes. Thus, at a certain level of generality, it contained a similar idea as did "Set it Off." Additionally, Robinson did send his submission to a department at New Line Cinema, albeit to a different department than the one that produced the film. Although upon a thorough and searching analysis of the facts and the parties' submissions, I concluded that Robinson failed to generate a genuine dispute of material fact as to a reasonable possibility of access and substantial similarity, this conclusion does not reflect an "objectively unreasonable" position advanced by Robinson. Rather, his view as to what constituted access and substantial similarity conflicted with the conclusion required by a sound application of legal precedent to the undisputed facts in the record.

New Line contends that Robinson's choice of forum (Maryland rather than California, where virtually all of the defendants reside and where the claim arose), his decision to sue numerous defendants (all commonly insured), and his decision to depose 14 individuals (necessitating two rounds of multi-day depositions on the West Coast) when considered in the aggre-

gate, militate in favor of an award. I am constrained to reject this contention.

First, Robinson should not be burdened by an award of attorney's fees for his counsel's choice of forum. Admittedly, defendants incurred travel expenses due to the choice of a Maryland forum, however, the decision of a plaintiff to litigate on his "home turf" provides scant reason to shift the burden of fees. It can be assumed that residents of California will predominate as defendants in claims arising out of theatrical films, but courts should hesitate for that reason alone to annoint California the preferential venue for the litigation of such claims. Undoubtedly defendants well knew, as reflected in the absence of a motion to transfer venue, Robinson possessed legitimate reasons for instituting the lawsuit in Maryland. He lives in Maryland, wrote the screenplay in Maryland, and retained copyright experts in Maryland. The existence of these factors makes his decision to sue in Maryland not objectively unreasonable, and thus does not weigh against him in the determination of whether to award fees to New Line.

Furthermore, even had Robinson chosen to sue fewer individuals, the crux of New Line's complaint—that the 14 depositions created unnecessary expense—would remain unchanged. Robinson would have likely deposed the same individuals, whether they were named parties or not, in order to pursue his action in a professionally appropriate manner. These depositions were necessary for Robinson to discover information pertaining to access, financial stake, supervision and development of the final screenplay, all information that was solely in the control and possession of the deponents.

Finally, there is no need in this case for an award of fees as a means of deterrence. New Line urges that fees are warranted because "there is a need to ensure that copyright infringement claims are not frivolously filed," and this proposition is most

certainly correct as an abstract principle. Because Robinson did not file his suit frivolously, however, it has little application here. An award of fees to New Line in this case will do little to advance the goals of deterrence. Robinson waited until securing an expert's opinion as to the similarity of both works, he sought early resolution of his claims and he abjured any attempt at extraordinary equitable relief intended to disrupt the orderly premiere of defendants' film. Whatever the interest in *general* deterrence may be in the abstract, there is no need to deter *Robinson* or those who would exercise the circumspection he manifested here.[3]

Therefore, a careful balancing of the appropriate factors does not persuade me that attorney's fees are warranted.

### III. CONCLUSION

For the reasons set forth above, I will deny plaintiff's motion to alter or amend and New Line's motion for an award of partial attorney's fees.

---

**3.** As to the argument concerning the unreasonableness of Robinson's settlement offer, I decline to weigh that factor in the balance although I have authority to consider it.